2022 IL App (2d) 210601-U
No. 2-21-0601
Order filed October 27, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Winnebago County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 15-CF-2839 |
| | ) | |
| RONALD A. MILLER, | ) | Honorable |
| | ) | Joseph G. McGraw |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE BIRKETT delivered the judgment of the court.
Justices Hutchinson and Schostok concurred in the judgment.

**ORDER**

¶ 1    *Held*:    The circuit court properly dismissed defendant's postconviction petition at the second stage and did not abuse its discretion in quashing subpoenas for the child victim's privileged counseling records.

¶ 2    Following a jury trial, defendant, Ronald A. Miller, was convicted of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)) (counts I and II) and aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2016)) (count III). Defendant appeals the circuit court of Winnebago County's second-stage dismissal of his petition filed under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2020)), arguing that he made a

substantial showing that both his trial counsel and appellate counsel provided him with ineffective assistance. Defendant also appeals the circuit court's decision to quash subpoenas for the child victim's counseling records. Additionally, the State moves for us to enter an order requiring the destruction of those counseling records. We affirm the trial court's judgments and deny the State's motion.

¶ 3                                          I. BACKGROUND

¶ 4       Having already extensively discussed the background of this case on direct appeal (*People v. Miller*, 2020 IL App (2d) 180424-U (*Miller* I)), we summarize only the facts relevant to the instant appeal. In January 2016, defendant was charged with two counts of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2016)), in that defendant knowingly committed an act of sexual penetration with the child victim, G.M., who was under 13 years old at the time of the offenses. Specifically, count I alleged that defendant placed his finger on G.M.'s vagina, while count II alleged that defendant placed his penis on G.M.'s anus. Defendant was also charged with aggravated criminal sexual abuse (720 ILCS 5/11-1.60(b) (West 2016)) (count III), in that defendant, who is G.M.'s biological father, allegedly placed G.M.'s hand on his penis for the purpose of sexual arousal and gratification.

¶ 5       On October 10, 2017, the matter proceeded to jury trial. During *voir dire*, one of the prospective jurors indicated that she was a part-time detention officer for "Winnebago County juvenile detention." However, the prospective juror indicated that nothing about her employment would affect her abilities to be fair or impartial if she were chosen to serve. The juror was eventually selected to serve as juror number two (Juror Two).

¶ 6       During opening statements, defendant's trial counsel (trial counsel) referenced G.M.'s outcry statement, suggesting to the jury that the outcry constituted a fanciful "story." Specifically,

trial counsel stated:

>"You're going to hear a lot about this story over the next couple of days, and that's all it is. It's a story in [G.M.'s] mind about what's going on.
>
>>She is going to tell you—apparently she's gonna [*sic*] come in [and] say something happened. It's not going to be the same thing that she said two years ago. Her story changes over time, and her story is outlandish."

¶ 7    Immediately after trial counsel's opening statement, Juror Two advised the court that she "[knew] someone that just walked into [the] room." The court told Juror Two that they would "deal with that later," as G.M. was in the midst of preparing to testify.

¶ 8    G.M. testified that she was seven years old and demonstrated that she knew the difference between the truth and a lie. The State asked G.M. whether she "ever learned about parts on her body that people shouldn't touch." G.M. responded, "Yes," stating that she learned as much "[w]hen [her] dad touched [her] privates." G.M. testified that she was "[f]ive or four" when her father first touched her. She recalled that he had touched her "coo-coo" while they were "[i]n the bathroom" at "[h]is house," where her paternal grandparents also lived. At the time, G.M.'s pants and underwear "were down." G.M. could neither recall "what happened when [defendant] touched [her] coo-coo," nor "if he touched [her] on the inside or the outside of [her] coo-coo." When asked "what it felt like" when defendant had touched her, G.M. responded, "Well, it hurted [*sic*] a little bit[,] but not too much, like getting your ears pierced."

¶ 9    G.M. could not remember "any other time that [defendant] touched [her] coo-coo with his fingers," or whether she ever saw defendant's "private." When asked whether defendant "ever touch[ed her] anywhere else on [her] body that he shouldn't have touched," G.M. responded in the negative. G.M. testified that she missed and loved defendant.

¶ 10    G.M. recalled "meeting a woman named Marisol [(Tischman)]" while "at the Carrie Lynn Children's Center [(Center)]," but could not remember when. Trial counsel asked, "Do you remember telling [Tischman] that [defendant] brought Dexter[, his parents' dog,] into the bathroom when he was hurting you?" G.M. could not recall. She also could not recall "saying that [Dexter] pooped all over [her.]" G.M. also did not remember telling Tischman that defendant had touched her in front of her aunt, or that her aunt had resultingly called the police. However, she remembered "that the police gave [defendant] one more chance" after they presumably responded to her aunt's call. G.M. recalled telling Tischman that, while being touched by defendant, she "told [defendant] to stop," but didn't remember mentioning that she "yelled it really loud *** and it breaked [*sic*] [his] ear drums." She could not recall earlier stating that defendant wore a cast, that defendant "called 911 on [her]," or "telling [Tischman] that *** [defendant] got arrested, and he breaked [*sic*] out of jail and never got caught again."

¶ 11    After G.M. testified, the court questioned Juror Two about her earlier interruption. Juror Two indicated that she recognized "the nurse [from the] juvenile detention" center she worked at, who had previously entered the gallery with G.M. She surmised the nurse was G.M.'s grandmother. The nurse had mentioned her grandchildren to the juror in the past. However, Juror Two was unaware of the nurse's name. The court asked Juror Two, "I don't know if that's her grandma or not, but let's just say for the sake of discussion that it is. Will that affect how you do your duties in this case at all?" Juror Two responded:

> "I want to say no, but I do know how she feels about her grand kids, and I mean it's
>
> not like I've met her once or twice. She's been at the facility for a couple of years in and
>
> out.
>
> So I want to say no, it wouldn't, but I was kind of surprised when I saw her, to be

honest with you."

Juror Two continued:

"Like I said, she didn't say anything about the case, but we've had extensive talks about different things. I guess I would say I'm uncomfortable."

¶ 12   The court confirmed that G.M.'s grandmother and Juror Two worked together, and trial counsel argued that Juror Two "should be excused for cause." The State responded that it was "opposed to cause," as "[t]he grandmother [was] not a witness," was "not gonna [*sic*] be testifying," and because Juror Two "doesn't even know the grandmother's name." The court questioned Juror Two:

"THE COURT: Okay, knowing that one of the spectators is the grandmother apparently of [G.M.], will you be able to give both sides a fair trial in this case?

JUROR [TWO]: Yes.

THE COURT: Okay. In other words, you won't do your duties any differently knowing that, you know, you're gonna [*sic*] go back to work after this case is over, and you may see her at some future date, it won't affect how you do your duties in this case at all?

JUROR [TWO]: No, no, I've worked in that position long enough to know better—

THE COURT: Okay.

JUROR [TWO]: —to that to discuss and what not to.

THE COURT: Okay. And so you wouldn't feel like you had to justify or explain any verdict you reached to her?

JUROR [TWO]: No, I would say tell [*sic*] her, you know, this is how it was, let's not speak about this. I would not afraid [*sic*] to say that."

Based on Juror Two's answers, the court did not remove her.

¶ 13    Lori Johnson testified that she was G.M.'s mother. Johnson was aware that defendant was living with "his mom and his step-dad," Debra and Bill Stonewall, "during the whole of [G.M.'s] life." On July 16, 2015, Johnson gave G.M. a bath before G.M. showed Johnson "her private" and asked, "Do I look red to you?" Johnson informed G.M. that she did not appear any different than normal. G.M. relayed to Johnson that "her dad touches her" and that "[h]er dad touched her pee-pee." Johnson responded, "Oh, he's helping you wipe." G.M. responded, "But without toilet paper." G.M. further related how, after touching her, defendant would "lick[] his fingers and wash[] his hands." Johnson asked G.M. how many times defendant had touched her, leading G.M. to hold up both hands, which Johnson took to mean "[t]hat he's done it more than once." Johnson did not notify the police or the Department of Children and Family Service (DCFS) of G.M.'s accusations at this point, but instead called G.M.'s physician, Dr. Rhodes.

¶ 14    Johnson testified that Rhodes eventually contacted DCFS concerning G.M.'s allegations, and DCFS advised Johnson to obtain an order of protection against defendant. Afterwards, G.M. was receiving another bath and told Johnson that "her dad runs his *** finger on her pee-pee to her butt." A few days later, G.M. told Johnson that defendant "held her hand up and touched her private." According to G.M., "[Defendant would] tell her, '[G.M.], I'm going to touch you every day and don't tell the mamas,' " purportedly in a reference to Johnson. G.M. also told Johnson that defendant "tied her up" with "gray tape."

¶ 15    On cross-examination, Johnson agreed that, "since she was a baby[,] [G.M.] had problems with constipation," leading to several doctor's visits. G.M. also "had had issues regarding urinary tract infections [(UTIs)]," and she would be given oral antibiotics as well as a cream to be applied to her vagina to treat any "redness." Johnson agreed that the "redness" was "frequently an issue."

¶ 16    Trial counsel asked Johnson whether she and defendant had "an argument concerning custody" prior to G.M.'s initial outcry. Johnson answered in the negative. Trial counsel then asked, "The fact is [defendant] told you he was going to take you back to court at that time, didn't he?" Johnson responded, "No. He didn't want her in school. So he was mad that she was starting school in August, but he wasn't, he didn't say anything about taking me to court."[1]

¶ 17    Later, on January 3, 2016,[2] G.M. had a visit with defendant's family and, upon returning home to Johnson, told Johnson that one of her aunts "handed her the phone and she talked to [defendant] during the visit," despite the fact that Johnson had obtained an order of protection prohibiting contact between the two.

¶ 18    Concerning G.M.'s initial allegations, trial counsel asked Johnson whether there "was also occasion sometime between July 18th of 2015 and October 17th of 2016 when [G.M.] told [her] that her daddy didn't do this." Johnson agreed. Johnson testified that she did not coach G.M. to say anything about defendant while at the Center.

¶ 19    Tischman testified that she previously worked at the Center in Winnebago County as lead forensic interviewer. She had interviewed "well over 2,500" children during her tenure. On August 6, 2015, Tischman was assigned to interview G.M. The State admitted and published a DVD recording of the August 6, 2015, interview with G.M., as well as several anatomical drawings that

---

[1]On redirect examination, however, Johnson clarified that defendant was actually upset with the idea of G.M. being placed in daycare.

[2]Defendant mistakenly stated "July 3rd of 2016" as the date of the disputed phone call, but later testimony adduced at trial, described below, reveals the correct date of the disputed phone call as January 3, 2016.

Tischman employed to test G.M.'s understanding of certain body parts.

¶ 20    The contents of the DVD are thoroughly discussed in *Miller I. Miller*, 2020 IL App (2d) 180424-U, ¶¶ 26-31. During the interview, G.M. alleged, unprompted, that defendant had touched her "coo-coo" many times. She went on to describe several times when defendant touched and penetrated her "coo-coo" with his finger, one instance where he made her touch his "coo-coo" or "wiener" with her hand, and another time when defendant placed his "wiener" between G.M.'s butt cheeks. G.M. compared defendant's "coo-coo" to several crayons that she held together, stating that his "coo-coo" was soft like skin and brown on its side. G.M. also claimed that her "grandma" had threatened to call the police if defendant touched G.M. again.

¶ 21    G.M. also made several unrelated allegations to Tischer, such as: (1) that defendant once had Dexter defecate "all over" G.M.; (2) that once, when defendant was touching G.M.'s "coo-coo," she had yelled for him to stop so loudly that it broke defendant's eardrum, requiring him to wear a cast; (3) that G.M.'s aunt, Debra Cannon, called the police as a result of defendant touching G.M., and that, once the police arrived, they decided to give defendant "one more chance;" (4) that defendant had been arrested before breaking out of jail; and (5) that defendant called 911 on G.M. so that he could continue touching her.

¶ 22    Rhodes testified that she was G.M.'s general pediatrician. On July 18, 2015, she had seen G.M. after Johnson told her that "G.M. had said that [defendant] touched her in her potty." G.M. told her that, while she normally uses the bathroom by herself, while visiting defendant, "[h]e goes in with her." G.M. told Rhodes that "she would go on the toilet and when she was done then [defendant] would take his hand and touch her private area." According to G.M., defendant did not use toilet paper when doing so, and sometimes his hand went "inside" her. Afterwards, defendant would wash his hands and "lick[] his fingers." G.M. stated that defendant did this "a lot

and it hurt."

¶ 23    Rhodes had seen defendant in the past and, before hearing G.M.'s accusations, never had any suspicions "about [G.M.] having been sexually abused by anybody." Rhodes became aware of "redness" or irritation around G.M.'s vagina, and G.M. had also complained that "it hurt when she voided." G.M. was diagnosed with having a UTI "[o]ne to two times," leading Rhodes to prescribe her with oral antibiotics. Rhodes agreed that "a [UTI] isn't something you could visually see," as they are "internal." "[I]f it looked like there was more irritation [on her vagina]" or it seemed as if G.M. had a yeast infection, however, Rhodes might have also prescribed G.M. with a "diaper cream" or a "yeast cream" to be applied to G.M.'s vaginal area. Rhodes acknowledged that, for a child G.M.'s age, a UTI or visible irritation around the vagina may be symptomatic of hygiene issues.

¶ 24    On cross-examination, Rhodes again confirmed that, for children G.M.'s age, UTIs can be caused by improper hygiene or through "some congenital anomalies." Trial counsel asked, "And so you often see the issues you're talking about like getting the [UTIs], is that one thing you often see as a result of that?" Rhodes responded, "Not often, but it can be seen." Rhodes agreed that "the same hygiene issues can cause either *** the [UTI] or the redness" that had been observed on G.M.'s vagina. This "redness" "had gone on for a period of a couple years with [G.M.]" Trial counsel asked, "You were not concerned that she was being sexually abused because she occasionally had redness in the vaginal area?" Rhodes responded, "Correct." Rhodes also had not been concerned that "[G.M.] was being sexually abused because she had urinary tract infections."

¶ 25    According to Rhodes, G.M. had previously seen a physician named Dr. Soufan in December 2015 for vaginal pain, and that he had noted a rash on her labia before diagnosing her with a yeast infection. Rhodes reiterated that, during any doctor's visits in which defendant was

present, she "[d]idn't see anything that raised any concerns."

¶ 26    Shannon Krueger testified that she is a certified pediatric nurse practitioner and a member of the University of Illinois College of Medicine Medical Evaluation Response Initiate Team (MERIT), which she identified as "the medical portion of the investigative process in child physical and sexual abuse." After describing her professional and educational backgrounds, medical training, and training in child abuse, the trial court recognized Krueger as an expert in the area of child abuse.

¶ 27    In August 2015, Krueger examined G.M. Once G.M. was alone with Krueger in an examination room, G.M. said "she was there because [defendant] touched her pee-pee and it hurt sometimes when he did it." G.M. also told Krueger that defendant "had told her that she would be in trouble if she told," but that she " 'didn't get in trouble.' " Johnson provided Krueger with G.M.'s medical history and told Krueger that G.M. "had had multiple [UTIs] and problems with her vaginal area[,] including rashes and pain with urination. She also reported a history of wetting the bed and also wetting herself." After a full body exam, Krueger did not find "anything of concern." The State asked Krueger, "And overall based just on that examination of [G.M.], *** what was your assessment or your findings?" Krueger responded:

> "My assessment was that I had several concerns about her past medical history naming, you know, mostly her history of urinary tract infections, constipation, vulvovaginitis or pain in the vaginal area and redness and rash. And also that [Johnson] had reported that she had frequent bed wetting episodes, wetting herself and having nightmares frequently and waking often at night."

So, while G.M.'s physical examination had been "normal," her medical history, along with the disclosures G.M. had earlier made, caused Krueger concern. Krueger reported:

"[B]etween 2013 and 2014 there [were] eight visits to her, either her primary care provider or convenient care that resulted in her needing a urine test done and she had complaints at each of those visits complaining of vaginal pain, pain with urination and mom, at times, would mention bed wetting at some of those visits.

There were two confirmed [diagnoses] of [UTIs]."

¶ 28 Krueger testified that the doctor's visits caused her concern, as did the fact that, "on three of those occasions[,] there was blood documented in [G.M.'s] urine which is really never normal in a prepubescent child." Krueger was also concerned by G.M.'s frequent rashes and "vulvovaginitis," which Krueger acknowledged "can be common in children," as the condition can result from improper hygiene.

¶ 29 When asked what Krueger believed "happened to" G.M. based on her training, her experience, her review of G.M.'s medical records, and her own examination of G.M., Krueger opined that the situation "was highly suspicious for child sexual abuse." In reaching this conclusion, Krueger explained that, based on her experience in primary care in which she saw thousands of children, it was somewhat normal for a child to experience vulvovaginitis "typically one, possibly two times." However, G.M.'s eight episodes of vulvovaginitis in a single year were "not a normal thing." Krueger reiterated that her findings were not solely based on G.M.'s physical examination, which seemed normal. Still, Krueger pointed out that, in most cases of child sexual abuse, physical examinations do come up normal, because any vaginal and rectal tissue damage resulting from abuse typically heals before an examination has been completed. Krueger testified that, "if [G.M.]'s last time seeing [defendant] was July 16th of 2015," it was "probable" that "any injuries she may have had would have been healed" by the time of Krueger's examination.

¶ 30 On cross-examination, Krueger agreed with trial counsel that children G.M.'s age, who are

becoming "potty trained," often have "hygiene issues." She also agreed that "there can be issues especially if a child is not monitored because they don't always wipe" or "wipe very well." Furthermore, if a child did not wipe herself and was left "sitting in wet underwear," that child would be susceptible to UTIs, "redness," fungal infections, and other maladies. To this point, Krueger agreed that G.M.'s medical records included notations "of the need to address [these] hygiene aspects."

¶ 31    Trial counsel asked, "So in this case what you found to be significant is the fact of the disclosures made by [G.M.] *** where she said, '[Defendant] touched my pee-pee,' and the fact that she's having constipation, the urinary tract infections and the rashes, correct?" Krueger responded, "And the abnormal urinalysis and urine, yes, and urine cultures." Trial counsel asked Krueger whether it was true that "all of those medical conditions can be ascribed to the fact of [G.M.'s] age and hygiene?" Krueger responded, "If they were infrequent and singular, but altogether with eight instances suggests that there's something more than the average normal kid who would maybe have one or two instances of any of those. But having all of those eight times in a year period is very unusual and not normal." When asked again whether G.M.'s medical conditions could theoretically be symptomatic of poor hygiene, Krueger responded, "It's possible of someone sexually abusing a kid." Krueger again explained that, if G.M.'s issues were solely the product of poor hygiene, doctors "would have a lot more kids with eight instances of coming to the physician complaining of vaginal pain and pain with urination." She continued, "[M]ost kids age three to five don't know how to wipe, but they manage to not need to see the doctor eight times complaining of pain in the vaginal area, having blood from their urine and having urine cultures that come back positive." Trial counsel pointed out that G.M. had still been "going to the doctor for the same issues six months after she[ had] seen" defendant. Krueger responded, "It went down

from seeing a doctor eight times to once, yes. She saw them once and there's been no visits since then for that problem." The State rested its case.

¶ 32 The defense called Debra Stonewall (Debbie), Debra Cannon, and defendant as witnesses. Debbie and Cannon—who is defendant's sister—testified as to defendant's living arrangement at the Stonewall residence, defendant's and Johnson's custody arrangements for G.M., and G.M.'s toilet training. Concerning G.M.'s toilet training, both Debbie and Cannon testified that, since G.M.'s toilet training began, she needed reminders and help wiping herself.

¶ 33 Additionally, Debbie and Cannon disputed some of the more implausible claims that G.M. had previously made to Tischman. Both witnesses could not recall a time in which defendant had ever been arrested and subsequently broken out of jail, a time in which defendant had called 911 on G.M., or a time in which defendant had worn a cast while watching G.M. Additionally, Cannon testified that she never called the police as a result of any interaction between defendant and G.M., as previously indicated by G.M. to Tischman.

¶ 34 Trial counsel sought to question Debbie concerning certain events that transpired on January 3, 2016. The State objected, arguing that "[w]hatever happened [on] January 3rd [was] not relevant." In response, trial counsel informed the court that, on January 3, 2016, "[G.M.] had made the statement to [Johnson] that she saw [defendant]" and that she spoke to him over the phone. Trial counsel wished to prove to the jury that this statement was untrue. The court sustained the State's objection before trial counsel made the following offer of proof:

> "[TRIAL COUNSEL]: [Debbie] would testify that there was a telephone call placed to her husband at, part of the telephone call she could hear the voice on the other end and it was her husband and it wasn't [defendant] on the phone call and there was no communication between [defendant] and [G.M.] on that date."

The court maintained that such testimony was irrelevant, and again sustained the State's objection. Following Debbie's testimony, trial counsel informed the court that it had three additional witnesses who were prepared to testify "primarily on the January 3rd incident." The court allowed trial counsel to make another offer of proof concerning the witnesses' testimony.

¶ 35    Debbie was recalled as an offer-of-proof witness. She testified that, on January 3, 2016, G.M. was visiting her daughter's Renee's house, when Debbie called her husband, Bill, so that he could speak with their grandchildren, including G.M. Debbie was able hear Bill speak to G.M. during the entirety of the call, leading her to believe there was no point in which defendant—who was still subject to an order of protection precluding him from contacting G.M.—could have "gotten on the phone" to speak to G.M. Defendant was still living at the Stonewalls' residence during the January 3, 2016, phone conversation.

¶ 36    Cannon also was recalled as an offer-of-proof witness and testified that she, too, was at Renee's house during the January 3, 2016, phone call. She also testified that the family had called Bill Stonewall, and that only Bill had spoken to G.M. over the phone. Bill additionally testified as part of the offer of proof. According to Bill, while speaking to G.M. over the phone on January 3, 2016, G.M. had requested to speak to her father, but he refused. "That was the extent of that whole conversation." Finally, Renee testified as part of trial counsel's offer of proof, consistent with the rest of the family's testimonies as to the phone conversation.

¶ 37    Trial counsel argued to the court that Debbie's, Cannon's, Bill's, and Renee's testimonies would show the jury that G.M. had been untruthful about the phone call, presumably to create an inference that her remaining allegations were unreliable. The State argued that any evidence of the phone call was inadmissible hearsay and improper character evidence. The court maintained its earlier ruling barring the testimony.

¶ 38   Defendant was called as the defense's final witness. He testified that he had taken Johnson to court concerning custody and visitation with G.M., and that, through mediation, a custody and visitation schedule had eventually been established between him and Johnson. Defendant testified that G.M. needed to be reminded to wipe once beginning toilet training, and that he or another family member would sometimes help G.M. with wiping if she requested assistance. These issues persisted through July 2015, although she had gotten somewhat better with wiping by that point. G.M. also had issues with constipation, redness on her vagina, and painful urination. She had seen Rhodes several times concerning these conditions.

¶ 39   Defendant testified that, prior to seeing G.M. in court, the last time he had seen her was July 18, 2015. Defendant went on to dispute all of the specific allegations leveled against him, as well as G.M.'s various allegations from the video interview with Tischman. He denied that, since G.M.'s birth, there had been a time in which he had "been arrested and broken out of jail." Defendant agreed that there was never "a point in time since [G.M.'s] birth that [he] wore a cast," that he called 911 on G.M., that Cannon called the police on him, or that the "police came and talked to [him] and gave [him] another chance." Defendant also testified that he had "some kind of argument [with Johnson] the weekend prior to July 16th of 2015 where [he] threatened to take her back to court" so that he could "[t]ake full custody" of G.M.

¶ 40   On cross-examination, defendant disagreed that he "ever put a cream on [G.M.]'s vagina," but he had helped her "wipe in the bathroom" and had previously bathed her as a child. When he washed her vaginal area, he did so "[n]ot in a sexual way," but "in a parenting way." Defendant disagreed that he had any qualms about G.M.'s attendance in school as Johnson had earlier testified.

¶ 41   Following defendant's testimony, the parties read the following stipulations to the jury:

"[I]f called to testify, Linda Langejans would testify that on June 13, 2017, [G.M.] told [Assistant State's Attorney] Jenny Clifford and Linda Langejans that [defendant] only touched her private two times in the bathroom of his house to put medicine on her vagina.

On July 17, 2017, [G.M.] told Jenny Clifford and Linda Langejans that she never saw [defendant's] penis, never touched [defendant's] penis[,] and [defendant] never helped her in the shower."

¶ 42 The defense rested. In her closing arguments, trial counsel highlighted numerous inconsistencies between G.M.'s various, out-of-court accusations and the evidence adduced at trial, telling the jury, "This is primarily a case of [G.M.] telling you the story. You have to believe [G.M.] and she is not consistent enough to be believed." Trial counsel further characterized G.M.'s allegations as "outlandish." Defense counsel also argued that Rhodes' testimony rebutted Krueger's opinion that G.M.'s medical history made it highly suspicious that abuse had occurred.

¶ 43 The jury found defendant guilty on all three counts. Defendant retained new counsel and filed a posttrial motion, arguing: (1) that the evidence was insufficient to establish his guilt beyond a reasonable doubt; (2) judicial bias at trial; (3) that the court erred in making several evidentiary rulings; and (4) error in refusing to excuse Juror Two.

¶ 44 The court denied defendant's posttrial motion and defendant was sentenced to seven years' of imprisonment on each of counts I and II, and six years' imprisonment resulting from defendant's conviction of count III, all to run consecutively.

¶ 45 Defendant timely appealed, arguing that: (1) trial counsel was ineffective for failing to make a pretrial challenge as to G.M.'s competency as a witness and for failing to present an expert witness at trial; and (2) that the evidence adduced at trial was insufficient to establish his guilt beyond a reasonable doubt. *Miller*, 2020 IL App (2d) 180424-U, ¶ 2. We affirmed, finding that

defendant's claims of ineffective trial counsel relating to G.M.'s competency were forfeited, and that the record lacked adequate development for us to evaluate his ineffective assistance claim relating to trial counsel's failure to retain an expert witness at trial. *Id.*, ¶¶ 75-76. Concerning defendant's final argument, we found that the evidence adduced at trial sufficiently established defendant's guilt. *Id.*, ¶ 97.

¶ 46    On August 13, 2020, defendant filed his petition for postconviction relief, which was later amended on August 14, 2020. The petition included five claims, that: (1) defendant received ineffective assistance of counsel when trial counsel failed to introduce expert testimony to rebut Krueger's trial testimony (Claim 1); (2) defendant received ineffective assistance of counsel when trial counsel failed to procure a "forensic child psychologist to review the circumstances surrounding [G.M.'s] out-of-court accusations" (Claim 2); (3) defendant received ineffective assistance of counsel when appellate counsel failed to challenge "the trial court's refusal to remove [Juror Two]" (Claim 3); (4) defendant received ineffective assistance of counsel when trial counsel failed to "introduce evidence of subsequent false allegations against [defendant] ***, and by his appellate attorney's failure to challenge the trial court's exclusion of such evidence at trial" (Claim 4); and (5) trial counsel was ineffective for failing to "perform a reasonable investigation of alternative explanations for the allegations of sexual abuse" (Claim 5). Defendant also filed a motion for discovery seeking G.M.'s updated medical and counseling records, generally arguing that the counseling records "[had] the potential to include exculpatory evidence."

¶ 47    On October 21, 2020, the circuit court advanced defendant's postconviction petition to the second stage. On December 7, 2020, the State filed its motion to dismiss defendant's postconviction petition. The State did not include any arguments as to forfeiture or waiver.

¶ 48    On January 28, 2021, the court heard arguments as to defendant's motion for discovery.

Defendant argued that he had "made a specific justification" for the counseling records, as it was his "belief that these records may contain exculpatory information." Specifically, defendant pointed out that "the record indicate[d] that GM received counseling related to these [sexual assault] allegations at three different locations," including the Center, Rockford Sexual Assault Center (RSAC), and Rockford Public School. According to defendant, a DCFS report from March 15, 2016, indicated that GM told a counselor at the RSAC, " [']I have to tell you, I have to tell you this, my dad didn't touch my private parts.[' ]" Defendant argued that "there's also indications that there were allegations of sexual touching that were made after her last contact with her father." Accordingly, defendant contended that "these counseling records could show improper touching or sexual abuse by someone other than [defendant,] which could help explain the allegations and would be exculpatory." Defendant believed the records might also show "improper influence by a custodial parent," in an apparent reference to Johnson.

¶ 49 After hearing the parties' arguments, the court agreed to "give [defendant] permission to subpoena the records, *** returnable to the [c]ourt." At that point, the court indicated that it would do an *in camera* inspection and "let the parties know what [it had] received and what, if anything, [it would] turn over." The subpoenas were to have "no end date," meaning the court would be able to review counseling records from the Center, RSAC, and Rockford Public School going into the present.

¶ 50 On April 7, 2021, counsel for G.M. filed an appearance in the instant matter. On April 8, 2021, defendant ascertained that the court had yet to receive subpoena returns from RSAC and the Center. On April 13, 2021, the court held a hearing "to provide responses to subpoenaed material," which defendant did not attend. The court turned over the RSAC records, which it had since received, to the State and asked them to send copies to defendant. On April 19, 2021, G.M. filed

her motion to intervene. In the motion, G.M. argued that, pursuant to section 120/4(a)(1.5) of the Rights of Crime Victims and Witnesses Act (Act) (725 ILCS 120/1 *et seq.* (West 2020)), she had a " 'right to notice and a hearing before a court ruling on a request for access to any of [her] records, information, or communications which are privileged or confidential by law.' " (Citing *Id*). She further argued that the records defendant sought were "confidential by law," and requested a hearing on defendant's request for access to counseling records.

¶ 51    G.M. also filed her motion to quash the subpoenas, arguing that, pursuant to section 110/10(d) of the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/10(d). (West 2020)), defendant was prohibited from subpoenaing her counseling records unless the subpoena was accompanied by a written order or by her written consent. Contending that these requirements had not been met, G.M. argued that her records could not be disclosed. G.M. further argued that the records at issue were "irrelevant to the matters before the court in that they [were] for records nearly one year past the date of the conduct leading to *** [d]efendant's charges," and that defendant was "attempting to use his subpoena power in the case at bar as a 'fishing expedition' to obtain information useful to him."

¶ 52    On April 21, 2021, the State filed its motion to vacate and quash defendant's subpoena on behalf of the Center, arguing that, as a rape crisis organization, it was unlawful for it to turn over G.M.'s privileged counseling materials without having first obtained G.M.'s consent. On April 22, 2021, the parties appeared, and the court granted G.M.'s motion to intervene. On April 23, 2021, G.M. filed a motion to adopt the State's motion to vacate and quash the subpoenas.

¶ 53    On April 30, 2021, the court held a hearing on the Center's motion to vacate and quash the subpoenas. At the beginning of the hearing, the State sought to clarify that, at the hearing, it would only argue "the motion of the *** Center." Kathy Pomahac, the executive director the Center,

testified that G.M. had taken advantage of the Center's free counseling services, which were "for the purpose of counseling and psychological support for aggravated criminal sexual assault." Pomahac had pulled G.M.'s file in relation to the subpoena and found that the records at issue constituted confidential communications between G.M. and the Center, which operated as a rape crisis center.

¶ 54 After the State was finished arguing its motion, G.M.'s counsel—who was also present at the hearing—asked the court whether she should argue her earlier "broader motion to quash," which related to all of the counseling records, or whether she should limit her arguments to the State's motion, which she had adopted. The court advised G.M.'s counsel to "make whatever comments [she] *** want[ed] [the court] to consider." G.M.'s counsel presented arguments as to both motions to quash. After hearing arguments from G.M. and defendant, the court ordered the State to turn over the subpoenaed counseling records both from RSAC and the Center for an *in camera* inspection.

¶ 55 On May 21, 2021, the parties reappeared for continued hearing on the State's motion to quash that had been filed on behalf of the Center and adopted by G.M. The court informed them that, pursuant to its inspection, it would not produce "any of the counseling records from either provider." It granted both motions to quash, entering an order stating that it "hereby grants the motions to quash [defendant's] subpoenas *duces tecum*, which were served upon [RSAC and the Center]."

¶ 56 On June 4, 2021, defendant filed a motion for clarification as to the court's order resolving the motions to quash. On September 3, 2021, the court held a hearing on the State's motion to dismiss defendant's postconviction petition, as well as defendant's motion for clarification. Following the parties' arguments as to the State's motion to dismiss, the court addressed the

motion for clarification, providing that it had found that the Center's privileged counseling records included "arguably exculpatory" materials. The court amended its earlier order as to the State's and G.M.'s motions to quash to reflect as much. On September 21, 2021, the court issued its memorandum of decision, granting the State's motion to dismiss in its entirety. Defendant timely appeals.

¶ 57                                                    II. ANALYSIS

¶ 58      On appeal, defendant argues that the circuit court erred in dismissing his postconviction petition at the second stage because he made a substantial showing that both trial counsel and his appellate counsel had been ineffective. Additionally, defendant contends that the circuit court erred in quashing the subpoenas for G.M.'s counseling records. Finally, the State filed a motion to strike and destroy G.M.'s counseling records, which we ordered to be taken with the case. We address these matters in turn.

¶ 59      "The Act provides a remedy for defendants who have suffered a substantial violation of constitutional rights at trial." *People v. Shipp*, 2020 IL App (2d) 190027, ¶ 26. "To be entitled to postconviction relief, a defendant must show that he has suffered a substantial deprivation of his federal or state constitutional rights in the proceedings that produced the conviction or sentence being challenged." *People v. Pendleton*, 223 Ill. 2d 458, 471 (2006). The Act provides for three separate stages of postconviction proceedings. *Shipp*, 2020 IL App (2d) 190027, ¶ 26. "At the first stage, the trial court independently reviews the defendant's postconviction petition and determines whether 'the petition is frivolous or is patently without merit.' " *Id.* (citing 725 ILCS 5/122-2.1(a)(2) (West 2012)). At that point, if the court finds that the petition "is frivolous or patently without merit, the court must dismiss the petition." *Id.*

¶ 60      Otherwise, the petition proceeds to the second stage, where the court analyzes the petition's

legal sufficiency. *People v. Domagala*, 2013 IL 113688, ¶ 35. The State may move to dismiss the defendant's petition, or it may file an answer in response to the petition. *Shipp,* 2020 IL App (2d) 190027, ¶ 27. "The dismissal of a postconviction petition is warranted at the second stage *** only when the allegations in the petition, liberally construed in light of the trial record, fail to make a substantial showing of a constitutional violation." *People v. Hall*, 217 Ill. 2d 324, 334 (2005). At this stage, the defendant's allegations must be taken as true unless they are "affirmatively refuted by the record." "In other words, the 'substantial showing' of a constitutional violation that must be made at the second stage [citation] is a measure of the legal sufficiency of the petition's well-pled allegations of a constitutional violation, *which if proven* at an evidentiary hearing, would entitle petitioner to relief." (Emphasis in original.) *Domagala*, 2013 IL 113688, ¶ 35. The dismissal of a postconviction petition without an evidentiary hearing is reviewed *de novo*. *Hall*, 217 Ill. 2d 324, 334.

¶ 61                          A. Ineffective Assistance of Trial Counsel

¶ 62    We turn first to defendant's arguments concerning his claims of ineffective assistance of trial counsel, as outlined in Claims 1, 2, 4, and 5 of his postconviction petition. "Every defendant has a constitutional right to the effective assistance of counsel under the sixth amendment to the United States Constitution and the Constitution of Illinois." *Domagala*, 2013 IL 113688, ¶ 36 (citing U.S. Const., amends. VI, XIV; Ill. Const. 1970, art. I, § 8). Claims of ineffective assistance of counsel are analyzed under the standards set forth in *Strickland v. Washington*, 466 U.S. 668 (1984); See *People v. Albanese*, 104 Ill. 2d 504, 526-27. To prevail on a claim of ineffective assistance of counsel, "a defendant must demonstrate that counsel's performance was deficient[,] and that the deficient performance prejudiced the defendant." *Domagala*, 2013 IL 113688, ¶ 36 (citing *Strickland*, 466 U.S. at 687). The first prong of the *Strickland* analysis requires courts to

contemplate whether counsel's conduct was "objectively unreasonable under prevailing norms," while the second prong of the *Strickland* analysis requires a consideration of whether "there is a 'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Domagala*, 2013 IL 113688, ¶ 36 (quoting *Strickland*, 466 U.S. at 694). "There is a strong presumption that counsel's performance falls within the wide range of reasonable professional assistance." *People v. Enis*, 194 Ill. 2d 361, 377 (2000). Reviewing courts should be "highly deferential to trial counsel on matters of trial strategy, making every effort to evaluate counsel's performance from his perspective at the time, rather than through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007).

> "A court need not consider whether counsel's performance was deficient prior to examining the prejudice suffered by the defendant as a result of the alleged deficiencies. [Citation.] Where the ineffectiveness claim can be disposed of on the ground that the defendant did not suffer sufficient prejudice, the court need not determine whether counsel's performance constituted less than reasonably effective assistance." *People v. Flores*, 153 Ill. 2d 264, 283-84 (1992).

¶ 63 Here, defendant asserts that trial counsel was ineffective for: (1) failing "to obtain an expert to rebut the State's child abuse expert;" (2) "failing to obtain a forensic child psychologist to help the jury evaluate the reliability of the video interview of GM;" (3) "failing to introduce evidence that GM and her mother made a subsequent false allegation of sexual abuse against [defendant] in January 2016, five months after [defendant] stopped seeing his daughter;" and (4) "failing to obtain family court records to show Ms. Johnson's pattern of using the courts to punish her paramours." We address these contentions in turn.

¶ 64   1. Failure to Retain an Expert to Rebut Nurse Krueger's Testimony

¶ 65    First, defendant has not demonstrated that trial court's performance fell below an objective standard of reasonableness where counsel did not obtain and call an expert witness to rebut Nurse Krueger's testimony. Therefore, the circuit court correctly dismissed Claim 1 of defendant's postconviction petition.

¶ 66    Again, to successfully state a claim for ineffective assistance, a defendant must establish that his or her counsel's performance was deficient, and that counsel's deficient performance prejudiced the defendant. *Domagala*, 2013 IL 113688, ¶ 36. To this point, a defendant cannot show deficient performance resulting from counsel's failure to offer cumulative evidence. *People v. Henderson*, 171 Ill. 2d 124, 151, 155 (1996); *Enis*, 194 Ill. 2d at 412.

¶ 67    Here, defendant argues that trial counsel's performance was deficient when she failed to "obtain an expert to rebut the State's child abuse expert." In arguing prejudice resulting from this failure, defendant contends that the State's case against defendant "was far from compelling," and that, to "bolster its case," the State relied on Krueger's testimony. Defendant reasons that, therefore, his trial would have ended differently had trial counsel retained an expert to point out the lack of medical evidence behind Krueger's testimony.

¶ 68    Defendant points to Dr. McCubbin's report, which was attached to defendant's postconviction petition, to establish how an expert could have effectively rebutted Krueger's testimony. In his report, McCubbin opines that, in this case, there was no medical evidence of sexual abuse, as "[u]rinary tract symptoms and red genital rashes are not uncommon in young girls." He describes how "[e]rythema," or "tissue redness," is commonly "caused by medical conditions other than trauma or sexual contact," while vulvovaginitis can be caused by many factors other than abuse. According to McCubbin, "[a] cluster of eight or so common urinary and vulvar findings during '2013-2014' is not 'highly suspicious' of sexual abuse." McCubbin further

mentions that, here, Rhodes held no suspicions of sexual abuse, and that G.M. continued to see a physician for similar medical issues after she had stopped spending time with defendant.

¶ 69    The findings in McCubbin's report are cumulative to evidence already adduced at trial. For example, while McCubbin opined that G.M.'s two confirmed UTI diagnoses were not uncommon and that "[a] cluster of eight or so common urinary and vulvar findings during '2013-2014' is not 'highly suspicious' of sexual abuse," this point had already been suggested by Rhodes, who testified that G.M.'s two reported UTIs and past complaints of inflammation—which she testified she was aware of—did not cause concern that G.M. was being sexually abused. Indeed, Rhodes repeatedly reiterated the fact that UTIs in children are commonly caused by improper hygiene or by "congenital anomalies," which "[s]ome kids are more accessible" to. Trial counsel recognized as much in her closing arguments, arguing before the jury:

> "When you have a doctor who was actually treating, treating [G.M.], saw her over a number of years since she was born with well visits and a variety of these issues; apparently she didn't see her every time, but she saw her for these visits. She sees her and says, believes that it's because it's a hygiene problem. Doesn't refer it on for anything else. She is the hands-on doctor dealing with [G.M.]
>
>     Now, a nurse practitioner[, Krueger,] is looking over [Rhodes'] shoulder. Despite [G.M.] having these issues in December of 2015, [Krueger] wants you to believe that this must be sexual abuse."

In his report, McCubbin acknowledges that his points concerning UTIs were already addressed by Rhodes.

¶ 70    While McCubbin discusses how tissue redness can commonly be caused by issues other than abuse, Krueger had already testified that children G.M.'s age, who are being "potty trained,"

often have "hygiene issues" and could be susceptible to UTIs. She also testified that G.M.'s medical history included notations "of the need to address [similar] hygiene aspects."

¶ 71    Similarly, while McCubbin's report specifies that vulvovaginitis may be common in prepubescent girls who "often lack the skill and knowledge to effectively clean themselves well," Krueger acknowledged that the condition "can be common in children," particularly in G.M.'s age range, as a result of hygiene issues. Furthermore, while McCubbin suggests that Krueger essentially ignored the fact that G.M. continued to experience redness after her contact with defendant had ceased, trial counsel already pointed out as much to Krueger during her cross-examination.  Because McCubbin's prospective evidence was cumulative to the evidence already adduced, trial counsel's performance was not deficient where she did not attempt to introduce such cumulative evidence. *Henderson*, 171 Ill. 2d at 151, 155.

¶ 72    Furthermore, while defendant argues that a medical expert such as McCubbin would have also established that G.M.'s medical issues persisted after contact with defendant had ceased, it was not beyond the ken of the average juror to recognize the timing of G.M.'s complaints. Accordingly, any expert testimony as to this point would be inadmissible. See Illinois Rule of Evidence 702 (eff. Jan. 1, 2011) ("If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.") ; *People v. Becker*, 239 Ill. 2d 215, 235 (2010) ("Expert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain").

¶ 73    Finally, defendant argues that our decision in *People v. Davis*, 377 Ill. App. 3d 735 (2007), which defendant asserts is "analogous" to this case, further establishes trial counsel's

ineffectiveness for failing to rebut Krueger's testimony through an expert witness. There, at the defendant's trial for felony murder, attempted armed robbery, and armed violence, the State sought to tie the defendant to the scene of the crime through a lip print identification that was found on a nearby roll of duct tape. *Davis*, 377 Ill. App. 3d at 738. The State's experts testified "that lip prints, like fingerprints and other impression evidence, are unique and can be used to positively identify someone," and that the Federal Bureau of Investigation (FBI) believed lip print identification constituted "a positive form of identification." *Id.* at 739-740. After being convicted of the aforementioned offenses, the defendant filed a postconviction petition, arguing that his counsel was ineffective for failing to adequately challenge the State's lip print evidence. *Id.* at 738. At the hearing on the petition, the defendant introduced the testimony of two experts in fingerprint identification, who—in stark contradiction to the State's trial experts—testified that "lip[ ]print identification is not recognized as an accepted science," and that, according to their research, "no scientific studies *** had conclusively established the accuracy and reliability of lip[ ]print identification." *Id.* at 740-741. The defendant's experts further testified that "there [were] no accepted practices within the forensic science community regarding the methodology for performing lip[ ]print identifications," that lip print identification was not embraced by the FBI, that lip prints were dissimilar to fingerprints in terms of identification, and that the lip print located on the duct tape roll could not be attributed to defendant. *Id.* The trial court agreed with the defendant that his counsel had been ineffective for failing to adequately rebut the lip print evidence, and we affirmed. *Id.* at 747.

¶ 74    *Davis* is plainly distinguishable from the instant matter. First, unlike in *Davis*, this case does not involve any issues of identification. Furthermore, here, unlike in *Davis*, the jury was already presented with the evidence proffered by the defense's expert—here, through Rhodes'

testimony—that in turn rebutted the State's expert. Nowhere in *Davis* did this court state or even infer that trial counsel may be ineffective for failing to rebut the State's expert *through cumulative evidence*. *Id.* For all of these reasons, defendant has failed to establish deficient performance resulting from trial counsel's failure to call an expert to rebut Krueger's testimony, and the trial court did not err in dismissing Claim 1 of defendant's postconviction petition.

¶ 75                    2. Failure to Obtain a Forensic Child Psychologist

¶ 76    Next, defendant argues that the circuit court erred in dismissing Claim 2 of his postconviction petition because he made a substantial showing that "[t]rial counsel provided ineffective assistance by failing to obtain a forensic child psychologist to help the jury evaluate the reliability of the video interview of GM." As a preliminary matter, however, we briefly turn to the State's argument that defendant forfeited this argument. "Postconviction proceedings permit inquiry into constitutional issues that were not, and could not have been, adjudicated on direct appeal." *People v. Cregan*, 2014 IL 113600, ¶ 18. Generally speaking, "the failure to raise an issue in a written motion for a new trial results in a [forfeiture] of that issue on appeal." *People v. Enoch*, 122 Ill. 2d 176, 186 (1988). Here, the State argues that defendant's posttrial counsel, who replaced trial counsel, failed to raise any ineffective assistance argument pertaining to trial counsel's failure to procure a forensic child psychologist. The State argues that, because defendant had the opportunity to raise this argument in his posttrial motion and did not, he has forfeited it on appeal.

¶ 77    As defendant points out, however, the State never raised this specific forfeiture argument before the trial court. Instead, the State had argued only that defendant's contentions were forfeited as a result of his failure to bring his argument on *direct appeal*. For this reason, the State forfeited its claim of forfeiture, and we consider defendant's claim. *People v. Jones*, 2018 IL App (1st) 151307, ¶ 47.

¶ 78    Turning to the merits of defendant's argument, "[e]xpert testimony is not admissible on matters of common knowledge unless the subject is difficult to understand and explain." *Becker*, 239 Ill. 2d at 235. Furthermore, "[u]nder Illinois law, it is generally improper to ask one witness to comment directly on the credibility of another witness [citations] as '[q]uestions of credibility are to be resolved by the trier of fact.' " *Id.* at 236 (quoting *People v. Kokoraleis*, 132 Ill. 2d 235, 264 (1989)). This same guideline applies equally to the State and criminal defendants. *People v. Simpkins*, 297 Ill. App. 3d 668, 683 (1998).

¶ 79    For example, in *Becker*, our supreme court was confronted with the issue of whether "the trial court abused its discretion when it excluded *** the expert testimony of Dr. Katherine Okla, concerning the reliability/credibility of hearsay statements made by O.B., the alleged child victim of sexual assault." *Becker*, 239 Ill. 2d at 218. There, the State sought to introduce certain hearsay statements made by O.B. during retrial. *Id.* at 219-220. Consequently, the court held a hearing pursuant to section 115-10 of the Code of Criminal Procedure of 1963 (Code) (725 ILCS 5/115-10 (West 2006)), in which O.B.'s mother, a family friend, and a police detective all testified as to O.B.'s earlier accusations against the defendant. *Id.* at 220.

¶ 80    During the hearing, O.B.'s mother testified that, after a bath, O.B. had indicated towards her vagina and told her that her father hurt her "front bottom." *Id.* at 221. O.B. had later asked her mother about the defendant's "special blue microphone," stating that it was "blue and shiny at the top," that "sometimes [her] daddy poked her with it," and that it "hurt sometimes." *Id.* The detective testified that he had conducted a video interview of O.B. *Id.* at 222. During the interview, O.B. repeated her accusations that the defendant had put his "blue microphone" in her "front bottom, but also provided the detective with "numerous inconsistencies." *Id.* For example, O.B. told the detective that the defendant's "blue microphone" "came from [his] head" and that her

mother had "also touched her with the blue microphone." *Id.* A family friend had also testified, informing the court that O.B. had told her that she had missed the defendant, but that he " 'hurt [her] front bottom.' " *Id.*

¶ 81     Okla, who specialized "in child and adolescent psychology," "forensic evaluation," and "treatment and questioning in child abuse cases," testified at the hearing that "O.B. 'may have been influenced' by 'post-event information and improper techniques.' " *Id.* Okla did not personally interview O.B. *Id.* Still, Okla opined that O.B.'s various hearsay statements to her mother may have resulted from implicit suggestion and a desire to please her "primary caregiver." *Id.* She further testified that O.B.'s statements to the detective may have been the result of intimidation, a "lack of ground rules at the beginning of the interview," and the detective's method of questioning. *Id.* at 223-24. Okla also mentioned that O.B. had made certain out-of-court statements to various psychologists—which are not described in the opinion—that resulted from those psychologists' "suggestive and coercive questioning." *Id.* at 223. Okla concluded that it was likely that O.B.'s "memory and answers were tainted," telling the court, " '[I]t does educate you hopefully about all the reasons why you should or should not put weight on her credibility one way or the other.' " *Id.* at 224. Okla also "stated her belief that O.B. could not give a 'reliable' statement in person on the stand." *Id.*

¶ 82     The court ordered that Okla's testimony should be excluded from the record and admitted O.B.'s various hearsay statements. *Id.* Ultimately, the jury found defendant guilty of predatory criminal sexual assault of a child and criminal sexual assault. *Id.* at 230. Our supreme court upheld the trial court's decision, noting that "[o]ne basis for exclusion is the impropriety of asking one witness to comment directly on the credibility of another." *Id.* at 235. It further found that Okla's testimony "would, for all practical purposes, advise the jury to disregard not only O.B.'s hearsay

statements, but her trial testimony as well, all without Okla having even interviewed O.B." *Id.* at 235. According to our supreme court, this would improperly "constitute direct, adverse comment on the 'credibility' of O.B., that is, 'credibility' in the broadest, utilitarian sense." *Id.* at 236. Even if it were to disregard this fact, our supreme court noted that "[it] would [still] uphold the trial court's decision [to exclude Okla's testimony] because what Okla was offering, *i.e.*, the observation that this young child, like any young child, might be influenced by suggestive questioning and improper investigative techniques, is not a matter beyond the ken of the average juror." *Id.* at 236-37.

¶ 83    Here, like Okla's proffered testimony in *Becker*, Thompson's proposed testimony would have essentially advised the jury as to the credibility of a child victim's hearsay statements. *Id.* at 235. For example, while Okla argued that O.B.'s hearsay statements could be explained away by post-event information, Thompson suggests that G.M.'s hearsay statements from Tischman's interview may have been tainted by "family attitudes and beliefs," possible "coaching," or "influence" from Johnson. While Okla pointed to the techniques of O.B.'s various interviewers in questioning the veracity of her statements, Thompson similarly pointed to Tischman's failure to "test for improper influences" in concluding that "[G.M.'s] statements made to Ms. Tischman *were no more reliable* than G.M.'s statements to others." (Emphasis added.) Thompson further questions Tischman's technique for failing to explore alternative hypotheses belying G.M.'s responses, providing, "This clearly is another example of ways in which [G.M.'s] statements were clearly unreliable." Accordingly, Thompson's proffered testimony directly relates to G.M.'s credibility and is therefore inadmissible under *Becker*. *Id.* at 236.

¶ 84    Alternatively, we also find that Thompson's proffered testimony is also inadmissible expert testimony in that it does not involve "a matter beyond the ken of the average juror," *i.e.*, "that

children are subject to suggestion" and "often answer in a way they believe will please adults." *Id.* at 236-38; See Illinois Rule of Evidence 702 (eff. Jan. 1, 2011). Moreso, while defendant argued at oral arguments that testimony such as Thompson's would have further aided the trier of fact in contextualizing G.M.'s prior recantations, any explanation as to G.M.'s recantations would not have provided the jury with any knowledge beyond that of an average lay person, and, at its core, would still constitute direct commentary on G.M.'s credibility. *Simpkins*, 297 Ill. App. 3d at 682-83. Because defendant cannot show prejudice resulting from trial counsel's failure to introduce inadmissible evidence, the circuit court properly dismissed Claim 2 of defendant's postconviction petition. *Domagala*, 2013 IL 113688, ¶ 36.

¶ 85    Defendant also argues that, in lieu of *Becker*, we should follow the reasoning employed in *People v. Cardamone*, 381 Ill. App. 3d 462 (2008), for a different result. There, after the defendant was charged with various sex crimes involving multiple minor children, the defendant offered to the court testimony from Dr. Brainerd, who was an expert in memory, false memory, interviewing, and memory suggestion, and who discussed how the child victims' videotaped statements "were unreliable" based on: (1) "the absence of any reliable confirmatory evidence;" (2) "the existence of disconfirmatory evidence;" (3) "infantile amnesia;" (4) "delayed memory reports;" (5) "falsification by suggestive questioning;" (6) "repeated tellings;" (7) "confirmation bias;" (8) inconsistency in memory reports;" and (9) "improper interview techniques." *Id.* at 500-01. Dr. Brainerd "specified that he was not opining on the complainants' credibility," but instead, "his testimony went to the reliability of the [victims'] statements." *Id.* The defendant also introduced proposed testimony from another expert named Dr. Huffman, who similarly indicated that "the complainants' in-court testimony might be unreliable." *Id.* at 503.

¶ 86    The trial court excluded both experts' testimonies, ruling that "Illinois courts do not allow

experts to testify to the reliability of child victim testimony, because it invades the province of the jury." *Id.* Regarding the portions of the proposed experts' testimonies relating to "the area of proper interview techniques," the trial court also found that "police officers' taking statements, having knowledge of facts from other witnesses, and asking suggestive questions are not outside the realm of the common experience of a lay juror." *Id.*

¶ 87 We reversed and remanded, ruling that the trial court improperly: (1) interpreted various precedent; (2) found that the experts' testimony concerned "the common knowledge of an average juror;" and (3) merged the concepts of "reliability" and "credibility," as defined by the experts. *Id.* at 506-07. Accordingly, we found that "[t]he [experts'] testimony *** was relevant as to whether the investigative techniques and the circumstances surrounding the allegations created distorted memories or misconceptions," and remanded so that the trial court could "assess the testimony on each issue and weigh its probative value against its prejudicial effect" pursuant to *Enis*, 194 Ill. 2d 361, 377. *Id.* at 507. However, we neglected to offer any "opinion regarding which, if any, portions of the testimony [were] admissible." *Id.*

¶ 88 We first note that *Cardamone* offers little assistance to defendant, as there, we explicitly reserved any ruling as to the admissibility of the experts' testimonies. *Id.* Regardless, even if *Cardamone* did support the admission of Thompson's offered testimony, it would directly contradict our supreme court's later holding in *Becker*, which found nearly identical expert testimony to be improper. *Id.* at 235-37. To this point, we further note that, in *Becker*, the third district appellate court—with one justice dissenting—relied on *Cardamone* in ruling that the trial court improperly excluded Okla's aforementioned testimony. *Id.* at 231-32. In reversing the appellate court, our supreme court rejected the third district's reliance on the holding in *Cardamone*, and restated the rule that it is improper to ask "one witness to comment directly on

the credibility of another." *Id.* at 236. As an appellate court, "[w]e are only obliged to follow the decisions of the Supreme Court of Illinois and of the United States Supreme Court, as both of these tribunals exercise appellate jurisdiction over the Appellate Court of Illinois." *People v. Leavitt*, 2014 IL App (1st) 121323, ¶ 48.

¶ 89    Defendant also haphazardly attempts to distinguish the instant matter with *Becker*, arguing, "*Becker* is distinguishable from the case at bar[,] which involves the reliability of out-of-court statements during a video interview." In other words, defendant seems to argue that Okla's proposed testimony in *Becker* was problematic because it dealt with the *credibility* of O.B.'s statements, while Thompson's proffered testimony deals with the *reliability* of G.M.'s statements. We recognize that defendant's argument is based upon the appellate court's prior reasoning in *Cardamone*, that the trial court improperly merged the concepts of "reliability" and "credibility" in improperly excluding Dr. Brainerd's testimony. *Cardamone*, 381 Ill. App. 3d at 506-07. Regardless, defendant's arguments as to the two terms offers us a distinction without difference. In Thompson's report, he attempts to distinguish the concepts of "reliability" and "credibility," providing that:

> "*Reliability*, as it is used in this report, refers to the accuracy of the procedures and information obtained during the investigation process. *** *Credibility* refers to the idea of believability—a subjective concept that reflects the extent to which the trier of fact accepts a given statement by a child or other witness as believable. *** The issue of credibility is solely the province of the trier of fact and will not be addressed in either this report or my testimony." (Emphasis in original.)

As suggested by defendant during the hearing on the State's motion to dismiss, this language from Thompson's report seems to have directly resulted from a "conversation" he had with defense

counsel concerning *Becker* and *Cardamone*:

> "And what I'll say finally on that, [y]our Honor, is that our expert, Dr. Thompson, was familiar. We discussed the *Becker* case and the *Cardamone* case, and he was very careful in crafting his opinion not to, not to issue any opinion about the credibility of the witness, but merely to talk about issues, psychological, psychological issues that would be helpful to the jury in analyzing this opinion."

Because either of Thompson's definitions of "reliability" or "credibility" directly relates to the weight in which the jury should afford to witnesses' testimony, however, any distinction between the two terms is immaterial. Surely, for example, if a juror were given cause to question "the reliability" of "the investigative process" behind G.M.'s recorded interview, as defined by Thompson, this would directly affect the believability of G.M., or, in other words, her *credibility*, as defined by Thompson. Still, regardless of the specific nomenclature Thompson employed in his in his report, the fact remains that his proffered testimony contains the same types of arguments and opinions that the *Becker* court found to be improper. *Id.* at 236. Defendant cannot escape *Becker's* rationale even if Thompson, who was seemingly aware of both *Becker* and *Cardamone*, sought to clothe his inadmissible opinion under the specific verbiage used in *Cardamone*.

¶ 90    For these reasons, even if defendant's trial counsel had attempted to offer expert witness testimony such as Thompson's to rebut G.M.'s video interview, the proffered testimony would be inadmissible pursuant to Illinois law. *Id.* Accordingly, defendant can show no prejudice resulting from trial counsel's failure, and the circuit court did not err in dismissing Claim 2 of defendant's postconviction petition.

¶ 91          3. Failure to Introduce Evidence of Subsequent False Allegations

¶ 92    Next, defendant has failed to show either deficient performance or prejudice resulting from

trial counsel's failure to introduce evidence of G.M.'s subsequent false allegations. Thus, the trial court did not err in dismissing Claim 4 of defendant's postconviction petition. Prior to discussing defendant's arguments, however, we once again briefly turn to the State's contentions that defendant has forfeited the matter on appeal. Specifically, according to the State, defendant's "claim raised below was ineffective assistance of counsel by trial counsel for failure to introduce evidence of subsequent false allegations of sexual abuse and by appellate counsel for failure to challenge the trial court's exclusion of that evidence." While not altogether clear—the State seems to reason that, because defendant's arguments on appeal make no reference to appellate counsel's failure to challenge the trial court's exclusion of G.M.'s subsequent false allegations, his appellate arguments are distinct from those brought before the trial court and are therefore forfeited. The State further argues that defendant has forfeited this issue because his posttrial counsel—who did not represent him at trial—did not raise the issue in a posttrial motion.

¶ 93    We flatly reject both of these arguments. As defendant points out, in his postconviction petition, he argued that "[defendant] was deprived of his Sixth Amendment right to effective assistance of counsel by his trial attorney's failure to introduce evidence of subsequent false allegations against [defendant] and his family, *and* by his appellate attorney's failure to challenge the trial court's exclusion of such evidence at trial." (Emphasis added.) Accordingly, Claim 4 of the postconviction petition consisted of two distinct subarguments: (1) that trial counsel was ineffective for failing to introduce evidence of subsequent false allegations; and (2) that appellate counsel was ineffective for not challenging the trial court's exclusion of certain subsequent false allegations. This first subargument—concerning trial counsel's performance—is almost identical to defendant's instant argument on appeal. For this reason, we find the specific issue raised on appeal *was* brought up before the trial court, meaning it was not forfeited. Furthermore, while the

State once again argues forfeiture as a result of posttrial counsel's failure to raise the issue in a posttrial motion, we do not see that the State raised this issue before the trial court, meaning the State's forfeiture argument is again forfeited. *Jones*, 2018 IL App (1st) 151307, ¶ 47.

¶ 94    Turning back to the merits of defendant's argument, again, a defendant cannot show deficient performance resulting from an attorney's failure to offer or introduce cumulative evidence to the court. *Enis*, 194 Ill. 2d at 412; *Henderson*, 171 Ill. 2d 151, 155. Here, defendant points out that, after Johnson obtained an order of protection precluding defendant from seeing G.M., defendant lost all contact with G.M. as of July 18, 2015. Nonetheless, according to defendant, in January 2016, "Johnson called the Loves Park Police Department falsely reporting that [defendant] had spoken to his daughter on the phone" during a visit with the Stonewalls, "in violation of the order of protection." G.M. also purportedly told her school counselor and a DCFS worker that she had physically seen her father during the visit. Recognizing that trial counsel at least attempted to introduce evidence concerning the January 3, 2016, events, defendant suggests that trial counsel's performance was nonetheless deficient, as trial counsel failed to properly explain the relevance of the false accusations. Defendant asserts prejudice resulting from this deficient performance, in that "[e]vidence that GM and [Johnson] made a new false allegation against [defendant] in January 2016 *** was critical to the defense" because it showed "Johnson using her daughter to manipulate the courts to deny all contact between GM and [defendant's] family." Defendant further argues that this evidence "would have helped the jury evaluate the credibility of the other allegations from the video interview."

¶ 95    Even if trial counsel had successfully introduced evidence of G.M.'s subsequent false allegations at trial, this evidence would be cumulative to the testimony at trial already suggesting

that G.M. had made other false allegations implicating her father of sexual abuse.[3] During Johnson's cross-examination, defense counsel asked her whether there "was also occasion sometime between July 18th of 2015 and October 17th of 2016 that [G.M.] told [her] that [defendant] didn't do this," referring to her earlier allegations of sexual abuse. Johnson answered, "Yes." Through questioning Debbie, Cannon, and defendant, defense counsel painstakingly established the falsity of numerous other abuse accusations G.M. made concerning her father, such as: (1) that once, when defendant touched G.M. inappropriately, she had yelled at him so loudly that it broke defendant's eardrum and required him to wear a cast; (2) that Cannon called the police as a result of defendant touching G.M., leading the police to give defendant "one more chance;" (3) that defendant had been arrested before breaking out of jail; and (4) that defendant called 911 on G.M. so that he could continue touching her. Stipulations were read to the jury that contained other recantations that G.M. had previously made to the State. Accordingly, the evidence of G.M.'s allegedly false statements resulting from the January 3, 2016, visit was cumulative to evidence already adduced at trial suggesting G.M.'s other facially false accusations, meaning trial counsel was not deficient for failing to introduce evidence of the subsequent false allegations. *Henderson*, 171 Ill. 2d 151, 155; *Enis*, 194 Ill. 2d at 412.

¶ 96    Furthermore, because any evidence of G.M.'s subsequent false allegations was not

---

[3]The State seems to suggest as much, arguing that Johnson had already acknowledged during cross-examination that G.M. had told her that she had spoken to defendant over the phone on January 3, 2016. However, when cross-examining Johnson, trial counsel had asked her about a phone call occurring on July 3, 2016, apparently confusing the date of the call. The jury was not made aware of trial counsel's error.

admissible, defendant cannot show prejudice resulting from trial counsel's failure to introduce evidence of the latter accusations. Our supreme court has consistently stated that "the proper procedure for impeaching a witness' reputation for truthfulness is through the use of reputation evidence and not through opinion evidence or evidence of specific past instances of untruthfulness." *People v. Cookson*, 215 Ill. 2d 194, 213 (2005). "This rule applies with equal force to all witnesses, regardless of age." *Id.* at 213. However, recognizing another longstanding rule, "that a witness may be impeached by a showing of bias, interest, or motive to testify falsely," our supreme court found that defendants accused of sexual assault *may* introduce evidence that their accuser has previously made false allegations of sexual assault for purposes of impeachment, but only where those statements are indicative of potential interest, bias, or motive to lie. *Id.* at 215-216.

¶ 97    Here, defendant clearly is attempting to impeach G.M. (and by extension, Johnson) through evidence of G.M.'s subsequent false allegations; defendant readily admits that this evidence would serve to call G.M.'s credibility into question. Therefore, under *Cookson*, the subsequent allegations are not admissible unless they show G.M.'s potential interest, bias, or motive to lie. *Id.* Defendant offers no evidence suggesting that G.M.'s false allegations fall into these three categories. Instead, defendant suggests that G.M. had an inherent motive or bias to lie so as to please Johnson, rendering her false allegations admissible even if they do not specifically indicate any such motive or bias:

> [I]n *Cookson*, the Illinois Supreme Court explained how a child can have 'unwitting[]...
> bias or motive not to tell the truth about the charged incident due to his custodial mother's
> hostile influence.' [Citation.] In the case at bar, GM was induced to lie through the negative
> influence of her mother, despite the fact that she loved and missed [defendant]." (Citing

*Cookson*, 215 Ill. 2d at 217.)

We disagree. Defendant's contentions rely on the *Cookson* court's attempts to reconcile our earlier decision in *People v. Nicholl*, 210 Ill. App. 3d 1001 (1991), with its holding. In summarizing the *Nicholl* decision, our supreme court explained:

"In *People v. Nicholl*, [citations], the defendant was convicted of aggravated criminal sexual abuse, and he appealed, arguing, in relevant part, the trial court erred by refusing to admit evidence of the victim's subsequent false accusation against him. As in this case, the proffered evidence involved a DCFS worker's conclusion the allegation was unfounded. [Citation.] The appellate court held the trial court should have admitted the evidence, including testimony from the alleged victim's father stating the child was not in the defendant's presence on the day in question, making it impossible for the uncharged abuse to have occurred. [Citation.] There was also evidence the child's mother had repeatedly threatened to 'get' defendant and the child had 'no independent recollection' of the subsequent incident of alleged abuse. [Citation]. Taken together, this evidence suggests the five-year-old victim may have, *albeit* unwittingly, had some bias or motive not to tell the truth about the charged incident due to the custodial mother's hostile influence." *Id.* at 217.

Accordingly, while attempting to reconcile *Nicholl* with its instant holding, the *Cookson* court suggested that evidence of a custodial parent's bias may be imputed onto a child victim's false allegations in certain circumstances, and, in such situations, the child's false allegations may be admissible for purposes of impeachment. *Id.* Here, defendant argues that there is evidence that Johnson was hostile towards defendant and that, resultingly, "GM was induced to lie through the negative influence of her mother." However, in making these arguments, defendant cites to no pages in the record for support. Accordingly, the arguments are forfeited. Ill. S. Ct. R. 341(h)(7)

(eff. Oct. 1, 2020).

¶ 98     Forfeiture aside, unlike the record in *Nicholl*, the record here seems to contradict any finding of improper influence on behalf of a custodial parent. When G.M. first indicated that defendant inappropriately touched her, Johnson was hesitant to contact the police. She had instead contacted Rhodes, who, in turn, contacted DCFS. It was only after DCFS advised Johnson to seek an order of protection against defendant that Johnson brought the matter before the court. Johnson readily testified as to facts that helped defendant's case, such as her admission that G.M. had previously recanted her allegations. From these facts, it seems apparent that Johnson gave defendant every benefit of the doubt prior to turning to the courts, belying defendant's argument that Johnson held some sort of a bias against defendant. Furthermore, G.M.'s testimony that she loved and missed defendant further belies the idea that she unwittingly inherited any bias or motive to lie from Johnson.

¶ 99     For all of these reasons, defendant has failed to show either deficient performance or prejudice resulting from trial counsel's failure to introduce evidence of subsequent, false allegations that G.M. had made against defendant stemming from the January 3, 2016, visit to the Stonewalls. As such, the trial court properly dismissed Claim 4 of defendant's postconviction petition.

¶ 100                    4. Failure to Obtain Family Court Records

¶ 101   Next, defendant has forfeited any arguments concerning trial counsel's ineffectiveness resulting from a failure to introduce evidence suggesting Johnson's proclivity to utilize the courts "to punish her paramours." Illinois Supreme Court Rule 341(h) (eff. Oct. 1, 2020) governs the contents of appellants' briefs. This rule carries the full force of law, meaning its provisions are mandatory and not mere suggestions. *Hall v. Naper Gold Hospitality LLC*, 2012 IL App (2d)

111151, ¶ 7 (citing *Niewold v. Fry*, 306 Ill. App. 3d 735, 737 (1999)). Illinois Supreme Court Rule 341(h)(7) (eff. Oct. 1, 2020) requires that an appellant's arguments be supported with citation to pertinent authority and to "the pages of the record relied on." "The failure to provide proper citations to the record is a violation of Rule 341(h)(7), the consequence of which is the forfeiture of the argument." *Hall*, 2012 IL App (2d) 111151, ¶ 12. "Points not argued are forfeited and shall not be raised in the reply brief, in oral argument, or on petition for rehearing." Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020).

¶ 102   On appeal, defendant argues that trial counsel was ineffective for failing to introduce certain evidence suggesting Johnson's pattern of using the court to "punish her paramours." However, in his brief, defendant devotes only two sentences—unaccompanied by any citation to the record—in vaguely suggesting deficient performance and arguably prejudice resulting from counsel's failure:

> "The record here shows that trial counsel failed to perform a reasonable investigation. As a result, the trial jury was presented with a one-sided, incomplete and distorted picture of the family dynamics which led up to the allegations against [defendant]."

Defendant's arguments are plainly violative of Rule 341(h)(7), which requires that an appellant's arguments contain "citation of the authorities and the pages of the record relied on."  Ill. S. Ct. R. 341(h)(7) (eff. Oct. 1, 2020). Consequently, defendant's arguments are forfeited. *Id.* Defendant offers no other arguments as to deficient performance or prejudice resulting from trial counsel's failure to introduce evidence of Johnson's previous court filings. As such, any contention of error whatsoever relating to the dismissal of this claim is similarly forfeited. *Id.*; *People v. Schuerich*, 2019 IL App (4th) 160441, ¶ 29 (defendant forfeited any claim of error concerning the dismissal

of his postconviction petition by failing to raise any arguments concerning the dismissal). For this reason, we uphold the trial court's dismissal of Claim 5 of defendant's postconviction petition.

¶ 103                    B. Ineffective Assistance of Appellate Counsel

¶ 104   Next, defendant asserts that the circuit court erred in dismissing Claim 3 of his postconviction petition because defendant made a substantial showing of ineffective assistance of appellate counsel. Here, defendant argues that his appellate counsel was ineffective for "failing to challenge the trial court's refusal to remove [Juror Two], who revealed her friendship with GM's grandmother and that she felt uncomfortable sitting on the jury after seeing her friend enter the courtroom."

¶ 105   Similar to claims of ineffective assistance of trial counsel, the aforementioned *Strickland* test also applies to claims of ineffective assistance of appellate counsel. *People v. Dobbey*, 2011 IL App (1st) 091518, ¶ 37. "A defendant who contends that appellate counsel rendered ineffective assistance, *e.g.*, by failing to argue an issue, must show that the failure to raise that issue was objectively unreasonable and that, but for this failure, defendant's conviction or sentence would have been reversed." *People v. Griffin*, 178 Ill. 2d 65, 74 (1997). A defendant cannot successfully allege prejudice resulting from appellate counsel's failure to raise a nonmeritorious claim on appeal. *Id.* Even more, "[a]ppellate counsel is not required to brief every conceivable issue on appeal, *** and it is not incompetence for counsel to refrain from raising issues that counsel believes are without merit." *People v. Edwards*, 195 Ill. 2d 142, 163-64 (2001). "Normally, appellate counsel's choices concerning which issues to pursue are entitled to substantial deference." *People v. Rogers*, 197 Ill. 2d 216, 223 (2001).

¶ 106   Criminal defendants hold a constitutional right to a fair trial and an impartial jury. *People v. Cole*, 54 Ill. 2d 401, 411 (1973). Furthermore, "there are certain relationships which may exist

between a juror and a party to the litigation which are so direct that a juror possessing the same will be presumed to be biased and therefore disqualified. In such a case it is not necessary to establish that bias or partiality actually exists." *Id.* at 413. Still, "[b]eyond these situations[,] which raise a presumption of partiality, a person is not competent to sit as a juror if his state of mind is such that with him as a member of the jury a party will not receive a fair and impartial trial. 'Impartiality is not a technical conception. It is a state of mind.' " *Id.* (Quoting *United States v. Wood*, 299 U.S. 123, 145 (1936)). "The burden of showing that the juror possesses a disqualifying state of mind is on the party challenging the juror." *Id.* In order to carry this burden, "more than a mere suspicion of bias must be demonstrated." *People v. Tondini*, 2019 IL App (3d) 170370, ¶ 18.

¶ 107    Pursuant to section 2(a) the Jury Act (705 ILCS 305/0.01 *et seq.* (West 2020)), jurors must be "of fair character." The Act further provides that a juror can be removed for cause if he or she fails to meet this qualification. 705 ILCS 305/14 (West 2020).

¶ 108    Here, defendant argues that "[i]t is clear from the record that Juror [Two] was not free of bias and would have felt uncomfortable acquitting the man accused of harming her friend's granddaughter." Relying on *People v. Boston*, 271 Ill. App. 3d 358, 361 (1995), defendant identifies two factors Illinois courts utilize in determining whether to exclude a juror based on bias: (1) whether a finding for the defendant would "require the prospective juror 'to deprecate a person with whom she had a close relationship;' " and (2) whether the prospective juror stated " 'unequivocally that she could be fair and impartial.' " (citing *Boston*, 271 Ill. App. 3d at 361). Pursuant to these factors, defendant reasons that Juror Two should have been excused because, "to find for the defendant, [Juror Two] would have had to deprecate her work friend who had spoken many times about her love for her grandchildren," and because Juror Two "did not unequivocally state that she could be fair and impartial." We disagree.

¶ 109　First, despite defendant's arguments to the contrary, there is no evidence in the record suggesting that Juror Two and G.M.'s grandmother shared a "close relationship" pursuant to the first *Boston* factor. *Id*. While the record does show that Juror Two was able to immediately recognize G.M.'s grandmother from her position at the juvenile detention facility, it further reveals that Juror Two was not even aware of her grandmother's name. It strains credulity to suggest that two people can share a "close relationship" as friends where those people have not even taken the rudimentary step of learning each other's names.

¶ 110　Second, defendant's argument that Juror Two "did not unequivocally state that she could be fair and impartial" is completely rebutted by the record. While Juror Two acknowledged feeling "uncomfortable" upon recognizing G.M.'s grandmother as a work acquaintance, her discussions with the court made absolutely clear the fact that she could remain a fair and impartial juror:

"THE COURT: Okay, knowing that one of the spectators is the grandmother apparently of [G.M.], will you be able to give both sides a fair trial in this case?

JUROR [TWO]: Yes.

THE COURT: Okay. In other words, you won't do your duties any differently knowing that, you know, you're gonna [*sic*] go back to work after this case is over, and you may see her at some future date, it won't affect how you do your duties in this case at all?

JUROR [TWO]: No, no, I've worked in that position long enough to know better—

\*\*\*

THE COURT: Okay. And so you wouldn't feel like you had to justify or explain any verdict you reached to her?

JUROR [TWO]: No, I would say tell [*sic*] her, you know, this is how it was, let's

not speak about this. I would not afraid [*sic*] to say that."

Juror Two unequivocally expressed that she could remain fair and impartial, despite her relatively inconsequential relationship with G.M.'s mother. Defendant bases his contention primarily on the fact that Juror Two first expressed discomfort upon seeing the grandmother, but defendant does not support this contention with any authority that discomfort, standing alone, is sufficient to demonstrate bias requiring the removal of a juror. Accordingly, defendant cannot show that he was prejudiced by appellate counsel's failure to bring a nonmeritorious claim, meaning the circuit court did not err in dismissing Claim 3 of defendant's postconviction petition. *People v. Rogers*, 197 Ill. 2d 216, 223 (2001).

¶ 111                      C. Motion to Quash Subpoena for Counseling Records

¶ 112 Finally, because defendant has neither shown good cause for conducting any postconviction discovery, and because G.M. held an absolute privilege over her counseling records, the circuit court did not err in quashing defendant's subpoenas for G.M.'s counseling records. "A trial court has inherent discretionary authority to order discovery in post-conviction proceedings." *People v. Johnson*, 205 Ill. 2d 381, 408 (2002). "A court must exercise this authority with caution, however, because a defendant may attempt to divert attention away from constitutional issues which escaped earlier review by requesting discovery." *Id.* In determining whether to allow a defendant to conduct postconviction discovery, a trial court should first determine whether a defendant has shown "good cause." *Id.* In determining whether a defendant has established good cause for conducting postconviction discovery, courts should consider: (1) how the discovery would relate to the issues presented in a postconviction petition; (2) the scope of the requested discovery; (3) the length of time between the defendant's conviction and the postconviction proceedings; (4) the burden on the State and other witnesses; and (5) the availability

of the evidence through other sources. *Id.* Courts should deny any request for postconviction discovery where the request amounts to little more than a "fishing expedition." *People v. Hickey*, 204 Ill. 2d 585, 598 (2001). We will not reverse a trial court's decision to quash a subpoena absent an abuse of discretion. *Enis*, 194 Ill. 2d at 415.

¶ 113    In defendant's motion for discovery, he argued that postconviction discovery was necessary because "[t]he record here reveals that GM received therapy from Jimmie Getter at the [RSAC], and from a school counselor," and that these counseling records had "the potential to include exculpatory evidence." At the trial court's hearing on the motion, defendant additionally argued that, according to a DCFS report, G.M.'s counseling records contained a recantation from G.M., who allegedly told her counselor, " [']I have to tell you, I have to tell you this, my dad didn't touch my private parts.['] " He further argued that the DCFS report also suggested that G.M.'s counseling records contained other false accusations against defendant, made after defendant and G.M. had ceased contact, as well as evidence that Johnson may have improperly influenced G.M.

¶ 114    Considering the above *Johnson* factors, we find that none of defendant's allegations established good cause to conduct any postconviction discovery. Considering the first factor—the relation between the discovery request and the instant postconviction petition—defendant did not show a likelihood that any information contained within G.M.'s counseling records would bolster any claims made in his postconviction petition. Again, here, defendant's postconviction petition consisted of several claims of ineffective assistance of trial counsel and appellate counsel. While defendant pointed to information suggesting that G.M.'s counseling records contained evidence of a recantation and subsequent, false allegations made against defendant, as we have found above, the record already contained evidence that G.M. had recanted—as established by Johnson's cross-

examination and the stipulations that were read to the jury. Accordingly, any evidence of a possible recantation contained within the counseling records was cumulative and could not be used to sustain a claim of ineffective assistance of counsel. *Henderson*, 171 Ill. 2d at151, 155; *Enis*, 194 Ill. 2d at 412. Similarly, as we have already found, any evidence that G.M. made subsequent, false allegations against her father would be inadmissible. *Cookson*, 215 Ill. 2d at 213. Defendant offers no specifics as to what kind of evidence of Johnson's "improper influence[s]" he expected to find in the counseling records, nor did he offer any explanation as to how this evidence would elevate any of his postconviction claims. For these reasons, defendant has failed to show that any evidence allegedly contained within G.M.'s counseling records would help him prepare his postconviction petition, which in turn suggests a lack of good cause for conducting postconviction discovery. *Johnson*, 205 Ill. 2d at 408.

¶ 115    The second *Johnson* factor—concerning the scope of the requested discovery—also supports our finding that defendant failed to establish good cause. *Id.* "A trial court does not abuse its discretion in denying a discovery request which ranges beyond the limited scope of a post-conviction proceeding ***." *Id.* Here, the allegations contained within defendant's postconviction petition concern events spanning from G.M.'s July 16, 2015, accusations against her father, through defendant's June 5, 2018, appeal. However, defendant's request for postconviction discovery, which was made in August 2020, did not specify any scope whatsoever for G.M.'s counseling records, Instead, defendant requested *all* of G.M.'s counseling records going into the present. Accordingly, defendant's request for G.M.'s counseling records covered more than two years' worth of records following any events described in the postconviction petition. Given the lack of any specific scope of defendant's discovery request as it related to his postconviction petition, the second *Johnson* factor further suggests a lack of good cause. *Id.*

Additionally, this factor further suggests that defendant's request for postconviction discovery amounted to nothing more than a fishing expedition. *Id.* This conclusion is amplified by the fact that defendant has failed to articulate any specifics as to the false allegations and evidence of improper influence allegedly contained within the records.

¶ 116    The third *Johnson* factor, concerning the amount of time elapsed between defendant's conviction and the postconviction proceedings, seems to have little import here. In weighing this factor, courts seem to have concluded that good cause is generally diminished as more time elapses between a conviction and a request for postconviction discovery. *People v. Morrow*, 2022 IL App (1st) 200388, ¶ 67. Here, defendant was convicted in October 2017, and he made his request for postconviction discovery almost three years later in August 2020. In the context of postconviction proceedings, we find that this amount of time is unremarkable one way or the other, and, accordingly, the third *Johnson* factor seems immaterial as to a finding of good cause. *Id.*

¶ 117    The fourth *Johnson* factor—dealing with the burden on the State and any other witnesses—weighs heavily against a finding of good cause. Here, both the State and G.M. filed motions to quash defendant's subpoenas, arguing that G.M. had an absolute privilege over her counseling records, which would be completely abrogated by allowing defendant access to the records. Given the undisputed existence of G.M.'s privilege over the counseling records, we find that G.M. would undoubtedly have been burdened by any disclosure of her counseling records. *People v. Harlacher*, 262 Ill. App. 3d 1, 9 (1994). Accordingly, the fourth *Johnson* factor weighs strongly against defendant. *Johnson*, 205 Ill. 2d at 408.

¶ 118    The final *Johnson* factor, dealing with the availability of the sought-after evidence through other sources, also weighs against a finding of good cause. Again, as part of his request

for postconviction discovery, defendant argued that G.M.'s counseling records contained a recantation, which in turn established a need for the records to be produced via discovery. However, defendant argues in his brief, "The record further shows that GM has been telling anyone who might listen to her—including [Johnson], therapists[,] and the trial prosecutors—that [defendant] did not abuse her." Consequently, defendant has admitted that the evidence he sought—G.M.'s alleged recantation contained within her counseling records—was duplicative of other evidence already contained in the record. Furthermore, as we have now repeatedly stated, any evidence of false, subsequent allegations from G.M. would have been inadmissible at trial. *Cookson*, 215 Ill. 2d at 213. While defendant further sought evidence from the records establishing some sort of bias Johnson held against defendant, we note that Johnson testified at trial, and trial counsel could and did question Johnson as to any bias. Accordingly, evidence of her bias could also have been found through other sources. For all of these reasons, we find that four out of the five *Johnson* factors weigh heavily against a finding of good cause to conduct postconviction discovery. For this reason, we do not find that the trial court abused its discretion in quashing the instant subpoenas.

¶ 119    Similarly, the circuit court's decision to quash the subpoenas should further be upheld by virtue of G.M.'s absolute privilege over her counseling records. Section 8-802.1 of the Code of Civil Procedure (735 ILCS 5/8-802.1. (West 2020)) provides an "absolute privilege for information provided to rape crisis personnel by victims of sexual offenses." *Harlacher*, 262 Ill. App. 3d at 9. This court has found that this absolute privilege bars a court from conducting an *in camera* inspection of rape counseling records. *Id.*

¶ 120    In *People v. Foggy*, our supreme court considered under what circumstances, if any, this absolute privilege "must yield" to a criminal defendant's request for privileged material,

specifically to be used in the cross-examination of witnesses. 121 Ill. 2d 337, 347 (1988). There, the defendant, who had been convicted of aggravated criminal sexual assault and unlawful restraint, argued that the trial court erred in quashing his pretrial subpoena seeking to obtain any portions of the victim's rape counseling records that related to the instant offense for *in camera* inspection. *Id.* at 340-341.

¶ 121    The *Foggy* court briefly discussed the U.S. Supreme Court's decision in *Davis v. Alaska*, 415 U.S. 308 (1974), where the Court "found a violation of the defendant's confrontation right in a prohibition on certain impeachment." *Id.* at 343. In summarizing *Davis*, our supreme court noted that there, before trial, "the prosecution requested a protective order to preclude defense counsel from cross-examining one of the State's principal witnesses regarding his juvenile record." *Id.* The trial court granted the request, "relying on State provisions that generally precluded use of juvenile records in judicial proceedings." *Id.* However, "[t]he United States Supreme Court reversed the defendant's conviction," as it "did not believe that the cross-examination of the witness had been adequate, for although defense counsel had been able to ask the witness whether he was biased, counsel had not been able to explore the possible sources of bias," which presumably could have been extrapolated from the witness's juvenile record. *Id.* at 343-344. Additionally, in *Davis*, "[t]he Court concluded that '[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of a defense witness." *Id.* at 344 (citing *Davis*, 415 U.S. at 320).

¶ 122    The *Foggy* court discussed a commentator's notes on *Davis*, which provided that:

"[i]n *Davis*, the privileged matter in effect represented a significant and irreplaceable means of impeaching the chief prosecution witness. By contrast, where the privileged

matter desired is of significantly lesser probative force or simply cumulative, its denial to the defendant has been held not to violate the constitutional guarantees."

¶ 123   Turning back to the merits of the defendant's arguments, however, the *Foggy* court noted that "[t]he privilege contained in section 8-802.1 is unqualified." *Id.* at 347. The court further noted that section 8-802.1 had recently been amended to remove any language allowing for *in camera* inspections, replacing that language with "a broader statement of confidentiality" and a "penalty provision *** which [made] an unauthorized disclosure a class C misdemeanor." *Id.* at 348. The court also noted that, there, "the defendant's request for an *in camera* inspection of the counseling records was merely general; he did not allege that information may exist in the counseling files that would be subject to disclosure." *Id.* at 349. Additionally, "the defendant had access to the array of unprivileged statements made by the complaining witness to other persons following the commission of the offenses," meaning the type of information he sought from the victim's records were available elsewhere. *Id.* Ultimately, citing "the strong policy of confidentiality expressed in section 8-802.1 and the absence of any indication by the defendant that the victim's communications with [her] counselor would provide a source of impeachment," our supreme court affirmed the trial court's decision to quash the instant subpoenas. *Id.*

¶ 124   Defendant argues that *Foggy* stands for the proposition that a rape victim's privilege over his or her rape counseling records is not absolute. Defendant therefore reasons that, in situations where a defendant has cited direct, specific evidence that rape counseling records contain exculpatory evidence, *Foggy* permits the disclosure of those counseling records. To this point, defendant further points out that here, the circuit court had already noted that the records at issue contained "arguably exculpatory" information.

¶ 125   We disagree. First, we note that, in *Foggy*, our supreme court never expressly provided

that the absolute privilege codified in section 8-802.1—which had since been amended to remove any language concerning *in camera* inspections—should yield to a defendant who makes a specific showing that rape counseling records contain exculpatory evidence. Instead, our supreme court found that there, where the defendant made no specific showing as to a need to obtain the absolutely privileged materials, there was no need to abrogate the victim's privilege over her counseling records. *Id.*

¶ 126    Nonetheless, even if the *Foggy* court did carve out such an exception to the absolute privilege codified in section 8-802.1, like the *Foggy* defendant, defendant here has failed to articulate any specific need to obtain G.M.'s counseling records. Again, defendant argued that the records should be subject to an *in camera* inspection because they allegedly contained a recantation from G.M., possible evidence of further false allegations she had made against defendant, and possible evidence that Johnson influenced G.M. into making her accusations against defendant. As we have now thoroughly discussed, this evidence would be cumulative, inadmissible, or available by other means. For these reasons, we disagree that *Foggy* supports defendant's position.

¶ 127    Defendant also contends that the State violated the U.S. Supreme Court's holding in *Brady v. Maryland*, 373 U.S. 83 (1963), when it failed to tender to defendant the RSAC records after collecting those records from the circuit court. As a result of this error, defendant seems to suggest that he should be provided with the RSAC materials. We disagree. "The United States Supreme Court set forth the government's affirmative duty to disclose evidence favorable to a defendant in *Brady v. Maryland*, 373 U.S. 83 [(1963)]." *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). "To establish a *Brady* violation, suppressed evidence must be both favorable to the accused and material." *Id.* Evidence is considered to be material " 'only if there is a reasonable

probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Id.* (citing *United States v. Bagley*, 473 U.S. 667, 682 (1985)). A *Brady* claim cannot be based on pure speculation that the withheld information would be material. *People v. Pecoraro*, 175 Ill. 2d 294, 315 (1997).

¶ 128   We reject defendant's contentions. Defendant has never laid eyes on any of the counseling records at issue, meaning he can only speculate as to the contents of those records or their materiality. Furthermore, while the circuit court provided that the records contained "arguably exculpatory" information, this does not suggest that the documents were material under *Brady*. Indeed, as we have already discussed, the types of exculpatory materials that defendant expected to find within the record—G.M.'s supposed recantation, evidence of subsequent false allegations against defendant, and evidence of Johnson having coached G.M.— are all either cumulative, inadmissible, or were available through other means, further cutting against any finding of materiality. *Henderson*, 171 Ill. 2d at151, 155; *Enis*, 194 Ill. 2d at 412; see also *Pecoraro*, 175 Ill. 2d at 315 (no *Brady* violation where the State allegedly withheld inadmissible polygraph results from the defendant). Accordingly, because defendant has failed to establish the materiality of the withheld documents, we reject his *Brady* argument. For all of these reasons, we find that the circuit court did not abuse its discretion in quashing defendant's subpoenas.

¶ 129     D. Motion for an Order to Strike and Destroy Improperly Obtained Protected Records

¶ 130   As a final matter, we address the State's motion for an order to strike and destroy G.M.'s counseling records, which we ordered taken with the case. Appellate motions "shall be in writing and shall state the relief sought and the grounds therefor." Ill. S. Ct. R. 361(a) (eff. Dec. 1, 2021).

¶ 131   In its motion, the State essentially argues that, because the proper procedures for

conducting an *in camera* review of privileged materials were not utilized by the trial court and defendant, "[t]his [c]ourt should not compound the error[s] by ordering further disclosure and/or transfer of the records," as "doing so would violate the victim-witness' constitutional and statutory rights." Instead, without citing to any authority allowing us to do so, the State argues that "this [c]ourt should order that the records be stricken and destroyed."

¶ 132   In making its argument, the State cites to provisions of the Illinois Constitution and the Act establishing a crime victim's rights to notice prior to any hearing before a court ruling on a request for the victim's privileged materials. Ill. Const. 1970, art. I, § 8.1(a)(2); 725 ILCS 120/4(a)(1.5) (West 2020). Pursuant to these provisions, the State argues that "[t]his [c]ourt cannot proceed on this motion without notice to [G.M.] and [G.M.'s] guardian." The State further cites to Illinois Supreme Court Rule 201(p) (eff. May 29, 2014), for further support that the counseling records should be destroyed. That rule provides:

> "If information inadvertently produced in discovery is subject to a claim of privilege or of work-product protection, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, each receiving party must promptly return, sequester, or destroy the specified information and any copies." Ill. S. Ct. R. 201(p) (eff. Sept. 1, 2006)

¶ 133   None of the rules that the State cites provide that an appellate court may order privileged records to be destroyed as a result of a trial court's failure to properly handle privileged materials. In fact, none of the sources the State cites pertain to appellate courts at all.  For example, while the State argues that we may not proceed on this motion until we have provided notice to G.M. and G.M.'s guardian, the Illinois Constitution and the Act, which the State relies on for this proposition, states that such notice is required only before a court issues a ruling on a request to

access to a victim's privileged records. Ill. Const. 1970, art. I, § 8.1(a)(2); 725 ILCS 120/4(a)(1.5) (West 2020). Here, we are not issuing any ruling on a request to access to a victim's privileged records. Instead, we are reviewing the propriety of the trial court's decisions, including its order quashing defendant's subpoenas for G.M.'s privileged records.[4] Therefore, neither the Illinois Constitution nor the Act require us to give notice to G.M. or her guardian before ruling on the instant motion.

¶ 134 Furthermore, although Illinois Supreme Court Rule 201(p) (eff. May 29, 2014) does describe a mechanism for destroying privileged records, the plain language of that rule only applies to situations where a party has inadvertently received privileged communications during discovery. We are not a party to the litigation, and we have not inadvertently received G.M.'s counseling records pursuant to any discovery disclosures. Therefore, Rule 201 does not apply to us. Ill. S. Ct. R. 201(p) (eff. Sept. 1, 2006). Consequently, the State has provided no authority suggesting any grounds to grant its requested relief by destroying G.M.'s counseling records, and we deny their motion. Ill. S. Ct. R. 361(a) (eff. Dec. 1, 2021).

¶ 135                                III. CONCLUSION

¶ 136 For the reasons stated, we affirm the judgment of the circuit court of Winnebago County's September 21, 2021, order dismissing defendant's petition for post-conviction relief, as well as the court's May 21, 2021, decision granting the State's motion to quash G.M.'s counseling records. We also deny the State's motion requesting us to enter an order requiring G.M.'s privileged counseling records be destroyed.

_____

[4]To this point, we further point out that the State never requested the relief it seeks here—the destruction of G.M.'s counseling records—before the trial court.

¶ 137   Affirmed.