2025 IL App (2d) 240574
No. 2-24-0574
Opinion filed July 29, 2025

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 22-CF-1440 |
| MCRED VALDERAMA, | ) ) | |
| Defendant-Appellee | ) ) | |
| (Zacharias Sexual Abuse Center, Contemnor-Appellant). | ) ) ) | Honorable Mark L. Levitt, Judge, Presiding. |

PRESIDING JUSTICE KENNEDY delivered the judgment of the court, with opinion.
Justices Hutchinson and Mullen concurred in the judgment and opinion.

**OPINION**

¶ 1 Zacharias Sexual Abuse Center (Zacharias) appeals the trial court's order finding it in indirect civil contempt for refusing to respond to defendant Mcred Valderama's subpoena requesting records related to the counseling of the alleged sexual assault victim, defendant's daughter, A.V. For the following reasons, we reverse.

¶ 2                                    I. BACKGROUND

¶ 3      Defendant is charged with seven counts of predatory criminal sexual assault of a child, two counts of criminal sexual assault, and one count of aggravated criminal sexual abuse arising out of allegations that defendant sexually abused A.V. between 2014 and 2021.

¶ 4      A.V. gave four interviews at the Lake County Children's Advocacy Center (Advocacy Center) between August 26, 2022, and April 28, 2023. Although the parties had access to recordings of these interviews, no recording or transcript was entered into the record. Instead, the trial court relied on the parties' representations of what was contained in those interviews.

¶ 5      The most detail regarding A.V.'s interviews comes from the State's proffer in its verified petition to deny pretrial release. According to the proffer, on August 26, 2022, A.V., a 14-year-old high school freshman, told her counselor that defendant had been sexually abusing her for years. Police and the Department of Children and Family Services were notified, and a victim sensitive interview was conducted that same day at the Advocacy Center.

¶ 6      At the interview, A.V. stated that she lived with her paternal grandparents, her mother, her brother, and defendant. A.V. described the abuse as beginning when she was 6 to 8 years old and continuing until she was 14. A.V.'s earliest memory of abuse was from fourth grade. She slept with her mother and defendant in their room. Her mother would wake up early to go to work, leaving her and defendant alone in the room. A.V. would be on her back, and defendant would rub his penis on her vagina and then masturbate until he ejaculated on her clothing. Defendant also made A.V. stroke his exposed penis with her hand. Defendant would tell her to keep this secret from her mother. This same pattern continued almost daily through fourth grade. A.V. described this behavior as continuing during sixth grade, but not as often; stopping during seventh grade;

and then picking up again in eighth grade, with the most recent abuse occurring within the last couple months of giving the interview at the age of 14.

¶ 7    The same day as A.V.'s interview, police went to defendant's residence and spoke with him. When defendant was informed that A.V. was accusing him of sexually abusing her, he told police that whatever his daughter said was true.

¶ 8    While in custody between August 26 and September 16, 2022, defendant called A.V.'s mother, Theresa, and his mother (A.V.'s grandmother) several times, in an attempt to get people to say "the right things" so he could get out of jail. On August 26, 2022, defendant called Theresa and asked her to come up with a plan to get him out of jail. On August 28, 2022, Theresa told defendant he would be represented by private counsel and that they were going to do everything they could to help him out. On August 29, 2022, defendant and Theresa discussed coordinating with defendant's attorney to get the case thrown out. Defendant constantly asked if everyone was on his side, and they told him they were. While talking with his parents, defendant said, "I hope the right things can be said and I can get out of here." He also asked if they had talked to the Filipino consulate because, if things went wrong, he then might want to be deported. Defendant also told his parents that he was going to talk to Theresa, saying, "if the right things get said to [his attorney] it'll get better." On September 6, 2022, defendant told Theresa about speaking with his attorney, saying that "if everything goes like it should, he should be back by Fright Fest," and that his attorney was going to give the "DA" some new information. On September 12, 2022, at approximately 8:33 a.m., Theresa told defendant she spoke with defendant's attorney and knew what she had to do to "get the ball rolling." She told defendant that she was doing a lot to get him back to the family and that she wanted to tell him what she was doing but could not.

¶ 9    On September 12, 2022, at approximately 10:15 a.m., less than two hours after her conversation with defendant, Theresa took A.V. to the Lake County Sheriff's Office and asked to speak with someone regarding A.V.'s case. Theresa told a detective that her daughter had come to her with a typed statement, dated September 6, 2022, stating that she made up the allegations against defendant.

¶ 10   A second interview was held at the Advocacy Center that same day. At this interview, A.V. explained that her statements from the August 26, 2022, interview were not true. A.V. told the interviewer that she was taken to defendant's attorney's office, where she told her mother that she had lied, and defendant's attorney suggested that she write a statement and be reinterviewed.

¶ 11   On September 13, 2022, police interviewed R.S., an "outcry witness" and A.V.'s friend. R.S. told police that A.V. told her that defendant had been raping her for the past seven or eight years. After defendant's arrest, A.V. stayed at R.S.'s house for the weekend. While there, A.V. told R.S. that her grandmother had told her to lie about how long the abuse had been occurring and say that it happened for only one or two years in order to "take a few years off." On September 15, 2022, police interviewed R.S. again, after being contacted by R.S.'s grandmother. R.S. told police that she had been in gym class with A.V. that day and that A.V. told her that her mom had asked her to lie and say that defendant did not abuse her.

¶ 12   On November 7, 2022, a police detective and victim advocate spoke with A.V. at the Advocacy Center. A.V. was asked about the statements she made to R.S., and A.V. said that she remembered making those statements. A.V. said that she knew her grandmother wanted her to say that nothing happened so that defendant could get out of jail, and that is why she changed her story. A.V. acknowledged that she had told friends that her family had asked her to change her story. A.V. said that the typed statement she gave to the sheriff's office on September 12 was not true.

She confirmed that she had been sexually abused by defendant and that she was telling the truth when she was first interviewed at the Advocacy Center.

¶ 13 On March 27, 2023, A.V. wanted to speak to detectives to provide more information about the abuse, stating that she gained confidence from going to therapy and was ready to fully disclose the abuse. Another interview was conducted on April 28, 2023, at the Advocacy Center. A.V. told the interviewer that, at the first interview, she was really scared and had not disclosed everything. A.V. added that when she was 8 to 12 years old, defendant made her perform oral sex on him "once or twice." This also occurred early in the morning in her parents' bedroom while her mother was at work. Defendant ejaculated into her mouth, and she spit it out because "it was gross." A.V. also disclosed that, during the same time period, defendant would rub his hand on her bare vagina in an up-and-down motion. A.V. also reaffirmed that her grandmother previously wanted her to say that she lied, and that she felt she had to say that she had lied to make everyone else happy.

¶ 14 As a result of A.V.'s fourth interview, defendant was charged on May 24, 2023, via supplemental indictment with two counts of predatory criminal sexual assault of a child (counts IX and X).

¶ 15 On April 8, 2024, defendant filed a motion for disclosure of protected records, requesting leave to subpoena Zacharias for "any records or notes for A.V., containing statements or a summary of statements made by A.V. regarding allegations of sexual abuse committed against her by the Defendant." Defendant's motion was brought pursuant to the Mental Health and Developmental Disabilities Confidentiality Act (740 ILCS 110/1 *et seq.* (West 2022)).

¶ 16 A hearing was held on defendant's motion on April 22, 2024. At the hearing, defendant argued that,

"we believe any notes or any records of what was said at Zacharias Center has direct bearing on her credibility. It also provides a basis for potentially why statements have changed; if there was any influence in now creating this fourth statement, that I think is certainly relevant, and we just wouldn't know that without the records, but we do know that this incident was discussed with Zacharias Center."

¶ 17    Following the hearing, the trial court ordered that Zacharias "disclose any written report or notes *** containing statements or summary of statements made by minor A.V. regarding allegations of sexual abuse for acts of sexual abuse committed by the Defendant against minor A.V." for an *in camera* review.

¶ 18    On April 24, 2024, the State filed a Motion to Reconsider and Quash Subpoena, in which it argued that section 8-802.1(d) of the Code of Civil Procedure (Code) (735 ILCS 5/8-802.1(d) (West 2022)) created an absolute privilege from the disclosure of the requested information even for *in camera* inspection.

¶ 19    The defendant filed a response to the State's motion on April 26, 2024. Defendant argued in his response that, in her third interview, "A.V. did not indicate that anything other than what she described in her first statement occurred," and that A.V.'s fourth interview "made additional allegations that differed from those made in her first interview." Defendant maintained that the statements A.V. made to Zacharias between her third and fourth interview directly resulted in the State filing additional charges, and that the statements made to Zacharias would be "by their very nature, inconsistent with at least 3 of her prior statements." Therefore, defendant argued, because the statements made to Zacharias were relevant and material, A.V.'s statements to Zacharias were discoverable in spite of the statutory privilege.

¶ 20    A hearing was held on the State's motion to reconsider on April 30, 2024. At the hearing

the State proffered that on March 24, 2023, A.V.'s mother reached out to police at the Advocacy Center and told them that A.V. wanted "to talk more about what happened to her because she's been going to therapy, and she's been talking about what happened to her in therapy." The State further proffered that, at the fourth interview, A.V. was asked why she decided to reveal the additional incidents of sexual abuse, and she responded, "[t]he defendant's been in jail, and now I don't feel in danger anymore. I am not scared, *** I'm not scared anymore." Defendant argued that his sixth amendment right to confrontation required an *in camera* inspection. See U.S. Const., amend. VI. Following the hearing, the trial court denied the State's motion.

¶ 21    On June 3, 2024, defendant filed a petition for rule to show cause against Zacharias. The trial court issued a rule to show cause against Zacharias on June 25, 2024. On June 26, 2024, Zacharias filed a response to the rule to show cause, arguing that service of the subpoena was improper and that the information requested was absolutely privileged, even against *in camera* review. Zacharias likewise filed a motion to quash subpoena.

¶ 22    On July 24, 2024, a hearing was held on the rule to show cause and Zacharias's motion to quash. At the hearing, the parties stipulated that Zacharias was a "rape crisis organization," its treatment providers were "rape crisis counselors," and A.V.'s communications were "confidential communications" as defined by the Code. The trial court ultimately denied Zacharias's motion, stating that "[i]t's unconscionable to think that a defendant such as Mr. Valderama could be convicted where information that could be viewed as exculpatory, noncumulative, and not inadmissible, and certainly not available by other means were to be hidden from him."

¶ 23    On July 31, 2024, the trial court requested additional briefing from the parties. After reviewing the parties' briefs, on September 9, 2024, the trial court stated that although the legislature intended to create a very strong privilege, the legislature could not abrogate a

defendant's constitutional rights. The trial court went on to pronounce:

"In this case Defendant has offered a reason to believe that counseling records would provide a source of impeaching material that are [*sic*] unavailable from other sources, namely Defendant stating that A.V. participated in four separate interviews, second interview A.V. recanting her allegations; in the third interview A.V. recanting again her recantation; in the fourth interview, additional allegations were made that were not made in the first interview.

Between the third and fourth interviews, counseling sessions began at Zacharias Center. As for knowing without a doubt whether there is impeaching material in the records, Defendant cannot know for sure without in-camera inspection, but there is, in my estimation, good reason to believe that impeaching material is present in the records in this case, and for that reason I am ordering Zacharias Center to turn over the records."

¶ 24    Following the court's pronouncement, Zacharias requested that the trial court enter an order *instanter*, finding Zacharias in contempt with a $1 per day fine, to allow for an immediate appeal. The trial court granted Zacharias's request, and Zacharias timely appealed.

¶ 25                                    II. ANALYSIS

¶ 26    At issue in this case is whether the trial court erred in finding Zacharias in contempt for refusing to comply with its order to produce A.V.'s confidential communications for an *in camera* inspection. Zacharias frames its argument as a matter of statutory interpretation regarding whether the Code permits *in camera* inspection of confidential communications made by victims of sexual abuse to rape crisis counselors, and it therefore concludes that the matter is subject to *de novo* review. We disagree with this framing.

¶ 27    First, civil contempt orders are ultimately reviewed for an abuse of discretion. *Tirio v.*

*Dalton*, 2019 IL App (2d) 181019, ¶ 72. Second, the trial court's basis for ordering the *in camera* inspection of A.V.'s confidential communications was based not on an interpretation of the Code, but rather on the trial court's belief that the privilege created by the Code must yield to defendant's sixth amendment confrontation rights (see U.S. Const., amend. VI). The question of whether abrogation of the statutory privilege created by the Code is necessary to preserve defendant's confrontation rights presents a question of law, which is reviewed *de novo*. See *People v. Leach*, 2012 IL 111534, ¶ 64.

¶ 28    The Code provides that, "Except as provided in this Act, no rape crisis counselor shall disclose any confidential communication or be examined as a witness in any civil or criminal proceeding as to any confidential communication without the written consent of the victim or a representative of the victim ***." 735 ILCS 5/8-802.1(d) (West 2022). The parties have stipulated that A.V.'s communications with Zacharias are "confidential communications" as defined by the Code, and that Zacharias's treatment providers are "rape crisis counselors."

¶ 29    The express purpose of the Code is

> "to protect victims of rape from public disclosure of statements they make in confidence to counselors of organizations established to help them. *** Because of the fear and stigma that often results from those crimes, many victims hesitate to seek help even where it is available at no cost to them. As a result they not only fail to receive needed medical care and emergency counseling, but may lack the psychological support necessary to report the crime and aid police in preventing future crimes." *Id.* § 8-802.1(a).

¶ 30    The seminal case regarding the Code is *People v. Foggy*, 121 Ill. 2d 337 (1988). Regarding the construction of the Code, our supreme court held that the legislature intended the privilege to be unqualified and absolute, barring even *in camera* inspection of a victim's confidential

communications. *Id.* at 347. The *Foggy* court noted that the legislature had eliminated a provision from the predecessor statute that expressly provided for an *in camera* inspection, replacing it with a broader statement of confidentiality, and adding a provision making unauthorized disclosure of victims' communications a Class C misdemeanor. *Id.* at 348.

¶ 31 In *Foggy*, the defendant was convicted of aggravated criminal sexual assault and unlawful restraint, following an incident where the defendant abducted the victim from in front of her home, drove her to a park, sexually assaulted her, and ultimately released her near a convenience store. *Id.* at 339. In the aftermath, the victim received counseling, and the defendant sought to subpoena her counseling records, ultimately requesting that the trial court conduct an *in camera* inspection of the records relating to communications regarding the commission of the offense. *Id.* at 340-41. The trial court quashed the defendant's subpoena, refusing to conduct an *in camera* inspection on the basis that the communications were privileged under the Code. *Id.* at 342. On appeal, the defendant challenged the constitutionality of the Code. *Id.* at 339. The *Foggy* court framed the issue as "whether an absolute privilege must yield to a criminal defendant's pretrial discovery request for otherwise privileged information that may provide material for use in cross-examining witnesses." *Id.* at 347. The *Foggy* court relied primarily on *Davis v. Alaska*, 415 U.S. 308 (1974).

¶ 32 In *Davis*, the defendant had been charged with grand larceny and burglary relating to the theft of a safe from a bar. *Id.* at 309. A "crucial witness" in the prosecution of the State's case was Richard Green, who identified the defendant as being near the location where the emptied and opened safe was ultimately discovered. *Id.* at 309-10. At the time of Green's identification, he was on probation by order of a juvenile court after having been adjudicated delinquent for burglarizing two cabins. *Id.* at 310-11. At the State's request, the trial court entered a protective order preventing the defendant from referencing Green's juvenile record, relying on Alaska Rule of Children's

Procedure 23, and Alaska Statutes section 47.10.080(g) (Alaska Stat. § 47.10.080(g) (1971)). *Davis*, 415 U.S. at 310-11.

¶ 33 The United States Supreme Court in *Davis* held that, in barring the introduction of Green's juvenile record, the trial court denied the defendant the right of effective cross-examination, as the defendant was then unable to challenge Green's credibility generally on the basis of his prior juvenile adjudication and, more specifically, was unable to develop against Green a claim of bias based on his vulnerable status as a probationer and concern that he might have been the suspect of the investigation. *Id.* at 316-18. The Supreme Court reversed the defendant's conviction, concluding that "[t]he State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness." *Id.* at 320.

¶ 34 Regarding *Davis*, the *Foggy* court maintained that the ability to challenge a claim of privilege depends on the criticality to the defense of the matter protected by the privilege, noting that, in *Davis*, the privileged matter represented a significant and irreplaceable means of impeaching the State's chief witness. *Foggy*, 121 Ill. 2d at 344 (quoting McCormick on Evidence § 74.2, at 179 (Edward W. Cleary ed., 3d ed. 1984)).

¶ 35 The *Foggy* court found that, unlike the defendant in *Davis*, the defendant's request "was merely general" and "not supported by any allegations that material useful to the defense *** was likely to be found." *Foggy*, 121 Ill. 2d at 347. Likewise, the *Foggy* court emphasized that "[the] defendant had access to the array of unprivileged statements made by the complaining witness to other persons following the commission of the offenses, including the nearly contemporaneous statements made by the victim to the store clerk, and also had available the victim's testimony at the preliminary hearing." *Id.* at 349. The *Foggy* court ultimately concluded that,

"[u]nlike the defendant in [*Davis*], who knew of specific information that could show bias or motive to fabricate on the part of the prosecution witness, and who had no other means of achieving that end, the defendant here has offered no reason to believe that the victim's counseling records would provide a source of impeaching material unavailable from other sources." *Id.* at 350.

¶ 36     The *Foggy* court also emphasized the "strong public policy in favor of the confidentiality of communications between sexual assault victims and counselors" and noted that the role of rape crisis counselors is not to investigate, but rather to help the victim understand and resolve their feelings about the event, and therefore counseling records are unlikely to result in the disclosure of matters material to the defense. *Id.* at 348-50. The *Foggy* court concluded that the defendant "was not denied due process, nor was his confrontation right violated, by the trial judge's refusal in this case to conduct an *in camera* inspection of the victim's counseling records." *Id.* at 350.

¶ 37     Later, this court considered the application of the Code in *People v. Harlacher*, 262 Ill. App. 3d 1, 9 (1994), where we found that the trial court properly quashed a subpoena issued to a rape counseling center without subjecting the records to an *in camera* examination. We reasoned that the Code creates an absolute privilege that bars *in camera* examination of such records. *Id.* However, *Harlacher* did not involve any discussion regarding the content of the victim's statements or the confrontation clause.

¶ 38     In *People v. Miller*, 2022 IL App (2d) 210601-U, this court again considered the application of the Code, as well as our supreme court's holding in *Foggy*. In *Miller*, the defendant appealed from the denial of his postconviction petition at the second stage. *Id.* ¶ 2. The defendant argued, *inter alia*, that the trial court erred in quashing a subpoena seeking the victim's rape counseling records following an *in camera* inspection of the documents. *Id.* The defendant claimed, based on

a Department of Children and Family Services report, that the victim had told her counselor that defendant had not touched her and had reported additional instances of sexual abuse after the defendant's last contact with the victim. *Id.* ¶ 48. The defendant suggested that the counseling records might also have shown improper influence by the victim's mother. *Id.*

¶ 39    The defendant argued that the privilege set forth in the Code was not absolute and that "in situations where a defendant has cited direct, specific evidence that rape counseling records contain exculpatory evidence, *Foggy* permits the disclosure of those counseling records." *Id.* ¶ 124. We rejected the defendant's argument, and instead found that *Foggy* never expressly provided that the absolute privilege codified in the Code

> "should yield to a defendant who makes a specific showing that rape counseling records contain exculpatory evidence. Instead, our supreme court found that there, where the defendant made no specific showing as to a need to obtain the absolutely privileged materials, there was no need to abrogate the victim's privilege over her counseling records." *Id.* ¶ 125.

Put another way, *Foggy* did not set forth a rule or test under which a defendant's confrontation rights may abrogate the absolute privilege established by the Code. Rather, *Foggy* found that, under the specific facts of the case (*i.e.*, where the defendant offered no reason to believe that the records would provide a source of impeaching material unavailable from other sources), there was no need to breach the privilege.

¶ 40    We ultimately held that the trial court's quashing of the subpoena was not an abuse of discretion because the evidence sought would have been cumulative, inadmissible, or available by other means. *Id.* ¶ 128. Specifically, there was already evidence of other recantations by the minor victim, there were statements regarding abuse by the defendant that were objectively false, and the

victim and her mother had been examined regarding any improper influence. *Id.* ¶ 118.

¶ 41 Defendant maintains that, in the instant case, unlike the defendant in *Foggy*, his "request is far from a fishing expedition but is, instead, narrowly tailored and entirely germane to the instant case." Defendant also relies on the trial court's finding that there was "good reason to believe that impeaching material is present in the records" that was unavailable from other sources. We disagree.

¶ 42 Defendant has offered no reason to believe that A.V.'s confidential statements would provide a source of impeaching material unavailable from other sources. First, defendant has failed to allege any specific facts regarding the victim's statements in the fourth interview that would suggest that her prior counseling sessions would contain a source of impeachment. Instead, he merely alleges that the fourth interview statements are inconsistent with prior interviews. The only indication of what was said in the fourth interview comes from the State's petition to deny pretrial release, which stated that A.V. told the interviewer that defendant forced her to perform oral sex "once or twice" when she was between the ages of 8 and 12 years old. There is no indication that this additional accusation in any way contradicts A.V.'s initial interview statements, let alone that anything she said in her counseling sessions would provide a source of impeachment to her eventual trial testimony. Obviously, the additional accusations are inconsistent with A.V.'s recantation in the second interview, but the recantation and its subsequent withdrawal occurred prior to A.V. attending counseling with Zacharias.

¶ 43 Further, to the extent that A.V.'s four statements are inconsistent with one another, there are other ample sources of potential impeachment evidence. A.V. can be cross-examined regarding her different statements, her recantation, and statements she made outside of counseling. Likewise, defendant can question A.V.'s mother, to whom A.V. spoke regarding going to the police with the

new accusations, as well as R.S. and A.V.'s grandmother who can testify regarding A.V.'s recantation. As such, potential impeachment was not unavailable from other sources.

¶ 44 The express purpose of the privilege created by the Code is to enable institutions such as Zacharias to provide victims with "the psychological support necessary to report the crime and aid police in preventing future crimes," which is precisely what happened in this case. A.V. attended counseling and, through that process, decided to speak with police regarding additional instances of abuse. In light of the strong policy considerations in favor of protecting victims' confidentiality, and the lack of any reason to believe that A.V.'s confidential statements would provide a source of impeaching material unavailable from other sources, the trial court's order calling for an *in camera* inspection of A.V.'s counseling records was a clear abuse of discretion at odds with explicit precedent to the contrary, including *Foggy* and *Harlacher* (and, though *Miller* is unpublished, its reasoning is consistent with precedent and persuasive) (see Ill. S. Ct. R. 23(e) (eff. Feb. 1, 2023)). Accordingly, the trial court's finding of contempt was likewise an abuse of discretion.

¶ 45 Defendant also contends that our supreme court in *People v. Sauls*, 2022 IL 127732, ¶ 47, held that the "showing for obtaining *in camera* review of confidential documents need not be more specific than the one presented by the defendant in [*Pennsylvania v. Ritchie*, 480 U.S. 39 (1987)]" and that the trial court was endeavoring to apply the *Ritchie* framework adopted by *Sauls*. We disagree with this assertion. First, there was no discussion of *Ritchie* or *Sauls* by the trial court. Second, the *Foggy* court expressly considered the United States Supreme Court's holding in *Ritchie* and determined that the unqualified privilege created by the Code was an "issue unresolved by *Ritchie*." *Foggy*, 121 Ill. 2d at 347. Therefore, we reject defendant's argument that *Sauls* is applicable here.

¶ 46                               III. CONCLUSION

¶ 47    For the reasons stated, we reverse the judgment of the circuit court of Lake County.

¶ 48    Reversed.

*People v. Valderama*, **2025 IL App (2d) 240574**

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Lake County, No. 22-CF-1440; the Hon. Mark L. Levitt, Judge, presiding. |
| **Attorneys for Appellant:** | David R. Del Re, of Del Re Law Group, of Waukegan, for appellant. |
| **Attorneys for Appellee:** | Jason S. Dreifuss, of Waukegan, for appellee. |
| *Amicus Curiae***:** | Eric F. Rinehart, State's Attorney, of Waukegan (Patrick Delfino, Edward R. Psenicka, and Stephanie Hoit Lee, of State's Attorneys Appellate Prosecutor's Office, of counsel), for *amicus curiae* People of the State of Illinois. |